UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------x

**THE BALLINGER COMPANY**
833 Chestnut Street
Philadelphia, PA 19107,

**Plaintiff,**

v.

**COMPLAINT**

**LEXINGTON INSURANCE COMPANY**
100 Summer Street
Boston, MA 02110,

No. _____

and

**AXIS INSURANCE COMPANY**
303 West Madison
Chicago, IL 60606,

**Defendants.**

----------------------------------------------------------x

Plaintiff The Ballinger Company, by its attorneys, Bazelon Less & Feldman, P.C. and Peter F. Marvin, Esquire, as and for a complaint against defendants Lexington Insurance Company and Axis Insurance Company, alleges as follows:

**INTRODUCTION**

1.       This action is brought by The Ballinger Company ("Ballinger"), a leading Philadelphia-based architecture and engineering firm, to secure coverage for a professional liability claim. Ballinger was covered by Lexington Insurance Company ("Lexington") on a "claims made" basis for at least five years until 12:01 a.m. on

February 1, 2012.  Ballinger was covered by Axis Insurance Company ("Axis") on a "claims made" basis starting at 12:01 a.m. on February 1, 2012.  Because the Axis Policy commenced immediately upon the termination of the Lexington Policy, Ballinger has always been covered against professional liability claims.

2.    Notwithstanding this unbroken chain of coverage, however, both Lexington and Axis have refused to provide Ballinger with the defense and indemnity that Ballinger has purchased on a professional liability claim that has been asserted against it.

3.  Ballinger, having been covered at all times, cannot be uncovered.

4.    Through this action Ballinger seeks a declaratory judgment declaring that either Lexington or Axis is, or both are, required to defend Ballinger and indemnify it against the multi-faceted claim that has been asserted against it.

## PARTIES

5.    Ballinger is a corporation organized under the laws of the Commonwealth of Pennsylvania with its principal place of business in Philadelphia, PA.

6.  Lexington is an insurance company organized under the laws of the State of Delaware with its principal place of business in Boston, MA.  Lexington describes itself as "an AIG Company."  Lexington is a "surplus lines insurer."  Upon information and belief, Lexington regularly conducts business in the Commonwealth of Pennsylvania and the State of New York.

7.    Axis is an insurance company organized under the laws of the State of Illinois with its principal place of business in Chicago, IL.  Axis is licensed to do business in the

Commonwealth of Pennsylvania and regularly conducts business in the Commonwealth of Pennsylvania and the State of New York.

## JURISDICTION AND VENUE

8.   Jurisdiction is premised on 28 U.S.C. §1332(a) & (c) in that this is an action between corporations that are citizens of different states and the amount in controversy exceeds Seventy-Five thousand dollars ($75,000), exclusive of interest and costs.

9.   Through this action, Ballinger seeks a declaration of its rights as contemplated by 28 U.S.C. §2201.  For the reasons set forth below and pursuant to Fed.R.Civ.P. 57, Ballinger requests that the Court order a speedy hearing of this matter.

10. Venue is proper in this district because both defendants have consented to venue in this district.

## BACKGROUND

11. Ballinger is a leading architecture and engineering firm headquartered in Philadelphia, Pennsylvania.

12. For many years, Lexington provided professional liability coverage to Ballinger under a series of policies for which Lexington charged, and Ballinger paid, significant premiums.

13. In 2011, Lexington was paid a premium for the coverage it was to provide of just under $300,000.

14. Lexington sold Ballinger its policy number 021456755 (the Lexington Policy").  The Lexington Policy became effective on February 1, 2011 and expired at 12:01 a.m. on February 1, 2012.  A true and correct copy of the Lexington Policy is attached as Exhibit "A".  The Lexington Policy is a "claims made" policy.

15. In early 2012, Ballinger moved its professional liability policy from Lexington to Axis.

16. Axis sold Ballinger its policy MBZ765473/01/2012 (the "Axis Policy"). The Axis Policy became effective on February 1, 2012 at 12:01 a.m. and continues to be effective to date. A true and correct copy of the Axis Policy is attached as Exhibit "B". The Axis Policy is also a "claims made" policy.

17. In short, Ballinger was at all times covered for its professional liability exposure by either the Lexington Policy or the Axis Policy.

18. By contract dated May 27, 2008, which contract was significantly modified both as to its scope and as to the fee Ballinger was to receive, Ballinger entered into an agreement with the University of Pittsburgh ("Pitt") to design a major building on the Pitt campus to be known as the Salk Hall Addition.

19. Pursuant to the modified agreement between Ballinger and Pitt, the Salk Hall Addition will be an 80,000 square foot building with a total cost of just under $40,000,000. Pitt agreed to pay Ballinger $3,187,000 plus reimbursable expenses for the work that Ballinger would perform on the Salk Hall Addition.

20. Construction on the Salk Hall Addition began in 2011.

21. By January, 2012, senior executives at Ballinger knew that the contractor constructing the Salk Hall Addition was progressing more slowly than had been anticipated. Ballinger also knew that the contractor had made statements that, in the experience and judgment of Ballinger's senior executives, suggested that the contractor could well assert a claim against Pitt at some point in the future. If the contractor did

assert a claim against Pitt, Ballinger was aware that Pitt, in turn, could assert that claim or a variant of it against Ballinger.

22. With the impending switch in insurers from Lexington to Axis, Ballinger was advised by Roehrs & Company, Inc., ("Roehrs") the broker who had sold Ballinger the Axis policy, that Ballinger should advise Lexington of the situation involving the Salk Hall Addition.

23. On January 31, 2012, Ballinger knew only that it had been advised that the Salk Hall project was experiencing "problems and delays" in the early stages of construction.

24. On January 31, 2012, Roehrs by email advised Lexington that there was an inchoate possible claim that was developing at Pitt (the "Lexington Claim").

25. As reflected on the industry-standard ACORD Notice of Occurrence/Claim form prepared by Roehrs, Lexington was aware that Ballinger's "Senior Management has been advised by University of Pittsburgh that this project is experiencing problems and delays in its early stages." (The Lexington Claim form sent to Lexington is attached as Exhibit "C".)

26.     The Lexington Policy provides as follows, if an insured becomes aware of a "circumstance" "likely to give rise" to a claim:

> If the Insured first becomes aware during the Policy Period of an actual or alleged Breach of Professional Duty or *circumstance* arising out of Professional Services which is ***reasonably likely to result in a Claim***, the Insured may give written notice to the Company containing the information listed below. If such written notice is received by the Company prior to the end of the Policy Period, any Claims subsequently made against the Insured arising out of such conduct shall be deemed for the purpose of this policy to have been made on the last day of the Policy Period. [Emphasis added]

27.     On January 31, 2012, Ballinger provided to Lexington all of the information that Ballinger had about a "circumstance" that could result in a claim involving the Salk Hall Addition.

28. After an exchange of correspondence between Lexington and Roehrs, by letter of March 5, 2012, Lexington refused to provide coverage for the Lexington Claim.  (The March 5th declination letter sent by Lexington is attached as Exhibit "D".)

29. On March 27, 2012, recognizing the position taken by Lexington in its letter of March 5, Ballinger, acting on the advice of Roehrs, made a similar, although not identical submission to Axis (the "Axis Claim").

30. On the ACORD Notice of Occurrence/Claim form sent to Axis by Roehrs on behalf of Ballinger, Roehrs stated: "Notice only.  Project University of Pittsburgh Salk Hall is experiencing significant delays in early construction.  Verbal communication with General Contractor and owner suggest that a future design/delay claim is inevitable." (The Axis Claim is attached as Exhibit "E".)

31. On April 10, 2012, Axis stated that there was no coverage available then for the matter submitted to it on March 27th because it was known to Ballinger before the inception of the Axis policy and had been reported to Lexington.  (The Axis letter of April 10, 2012 is attached as Exhibit "F".)

32. On October 31, 2012, Pitt sent to Ballinger a letter setting forth claims that Pitt asserts that it has against Ballinger for professional errors Pitt alleges Ballinger made. (Pitt's October 31st Letter is attached as Exhibit "G").

33. Pitt's October 31st Letter was forwarded to Axis on November 3, 2012.

34. Pitt's October 31st Letter was forwarded to Lexington on December 11, 2012.

35. On December 12, 2012, Pitt forwarded to Ballinger a letter addressed to Pitt dated December 6, 2012 from Burchick Construction Company, the contractor constructing the Salk Hall Addition.  (The "December 6th Letter).  (The December 6th Letter is attached as Exhibit "H").

36. In the December 6th Letter, Burchick asserts that Ballinger "actively interfered" with Burchick's performance of its work by not approving its submittals in a timely fashion and similar professional failings.

37. The statements made in the December 6th Letter are patently false and Ballinger has so advised Burchick.

38.  The December 6th Letter was forwarded to Lexington on December 13, 2012.

39.  The December 6th Letter was forwarded to Axis on December 13, 2012.

## V.  **The Policies**

40.  The Lexington Policy and the Axis Policy have similar structures.  In each policy, the insured is encouraged to report a "circumstance" that might lead to a claim as soon as the insured is aware of the "circumstance."

41.  The Lexington Policy provides:

If the Insured first becomes aware during the Policy Period of an actual or alleged Breach of Professional Duty or *circumstance arising out of Professional Services which is reasonably likely to result in a Claim,* the Insured may give written notice to the Company containing the information listed below. If such written notice is received by the Company prior to the end of the Policy Period, any Claims subsequently made against the Insured arising out of such conduct shall be deemed for the purpose of this policy to have been made on the last day of the Policy Period. [Emphasis added].

42.  The Axis Policy provides:

If during the Policy Period you become aware of a Circumstance and give notice to us of:

    a. the facts and situation surrounding the Circumstance, including any associated actual or alleged Wrongful Act;

    b. the Damages which have or may result from the Circumstance; and

    c. how and when you first became aware of the Circumstance and any associated actual or alleged Wrongful Act;

then any Claim for which coverage is provided by this Policy that may be made against you arising out of the Circumstance shall be deemed for the purposes of this insurance to have been made on the date on which the notice was given to us.

43. Similarly, both the Lexington Policy and the Axis Policy state that the insured is provided coverage unless, prior to the beginning of the carrier's coverage period, the insured had: "knowledge of any act, error, omission, situation or event that could reasonably be expected to result in a Claim;" (Axis) or "knowledge of the Breach of Professional Duty or circumstance likely to give rise to a Claim under this policy." (Lexington).

## COUNT I

## DECLARATORY JUDGMENT

44. The averments of paragraphs one through 43 are incorporated herein as if fully set forth.

45. The Axis Policy provides:

We will pay on your behalf those sums in excess of the Deductible and up to the Limit of Liability that you become legally obligated to pay as Damages or Claim Expense because of Claims arising out of Wrongful Acts or Pollution Events that take place on or after the Retroactive Date and prior to the end of the Policy Period, provided such Claims are:

first made against you and reported to us in writing during the Policy Period or the Optional Tail Coverage (if purchased); or

first made against you during the Policy Period and reported to us in writing during the Extended Reporting Period (if applicable).

This insurance applies only when prior to the effective date of the first policy issued to you and continuously renewed by us, no principal, partner, director, executive officer, or any person whose signature appears on any application of yours had knowledge of any act, error, omission, situation or event that could reasonably be expected to result in a Claim.

46. The Axis Policy also provides:

We have the right and duty to defend any Claim to which this insurance applies, even if the allegations are groundless, false or fraudulent.

47. The Lexington Policy provides:

The Company will pay on behalf of the Insured those sums in excess of the deductible shown in Item 4 of the Declarations that the Insured shall become legally obligated to pay as Damages because of Claims for a Breach of Professional Duty in the performance of Professional Services rendered to others by the Insured or any entity for whom the Insured is legally liable.

48. If the January 31, 2012 Lexington Claim was a report of "an actual or alleged Breach of Professional Duty or circumstance arising out of Professional Services which is reasonably likely to result in a Claim," then Lexington is obligated to defend and indemnify Ballinger.

49. Conversely, if the January 31, 2012 Lexington Claim was not a report of an "act, error, omission, situation or event that could reasonably be expected to result in a Claim," then Axis is obligated to defend and indemnify Ballinger.

50. If the claim asserted by the University of Pittsburgh in the October 31st Letter arose out of the same circumstance as that described in the report furnished to Lexington on January 31st of "an actual or alleged Breach of Professional Duty or circumstance arising out of Professional Services which is reasonably likely to result in a Claim," Lexington is obligated to defend and indemnify Ballinger.

51. If the claim asserted by the University of Pittsburgh in the October 31st Letter did not arise out of the same circumstance as that described in the report

furnished to Lexington on January 31st of "act, error, omission, situation or event that could reasonably be expected to result in a Claim" Axis is obligated to defend and indemnify Ballinger.

52. If the claim asserted by the University of Pittsburgh when it forwarded the December 6th Letter arose out of the same circumstance as that described in the report furnished to Lexington on January 31st of "an actual or alleged Breach of Professional Duty or circumstance arising out of Professional Services which is reasonably likely to result in a Claim," Lexington is obligated to defend and indemnify Ballinger.

53. If the claim asserted by the University of Pittsburgh when it forwarded the December 6th Letter did not arise out of the same circumstance as that described in the report furnished to Lexington on January 31st of "act, error, omission, situation or event that could reasonably be expected to result in a Claim" Axis is obligated to defend and indemnify Ballinger.

**WHEREFORE**, Plaintiff The Ballinger Company respectfully requests that this Honorable Court declare:

      a.      that Lexington Insurance Company is obligated to defend and indemnify Ballinger under the Lexington Policy; or

      b.      that Axis Insurance Company is obligated to defend and indemnify Ballinger under the Axis Policy; or

      c.      that Lexington is obligated to defend and indemnify Ballinger under the Lexington Policy and that Axis is obligated to defend and indemnify Ballinger under the Axis Policy;

      and that the Court award Ballinger its costs including reasonable counsel fees.


Dated: Philadelphia, Pennsylvania
       January 14, 2013


                           **BAZELON, LESS & FELDMAN, PC**

                           By: _____
                           Noah H. Charlson (NC 4859)
                           1515 Market Street
                           Philadelphia, PA 19102
                           215.568.1155
                           NCharlson@Bazless.com


                           Of Counsel:

                           Peter F. Marvin
                           P.O. Box 4039
                           Philadelphia, PA 19118
                           215.248.5201
                           Pmarvin@PMarvinattorney.com


                           *Attorneys for Plaintiff*

# EXHIBIT A

# LEXINGTON INSURANCE COMPANY

Administrative Offices:  100 Summer Street, Boston, Massachusetts 02110-2103
(hereinafter called the Company)

## ARCHITECTS & ENGINEERS PROFESSIONAL LIABILITY POLICY

Policy No.:   021456755                    Renewal of:   021456755

NOTICE: THIS IS A CLAIMS-MADE POLICY.  SUBJECT TO THE TERMS AND CONDITIONS OF THE POLICY, THIS INSURANCE APPLIES TO ONLY THOSE CLAIMS THAT ARE FIRST MADE AGAINST THE INSURED AND REPORTED TO THE COMPANY DURING THE POLICY PERIOD.

## DECLARATIONS

The insurer which has issued this insurance is not licensed by the Pennsylvania Insurance Department and is subject to limited regulation.  This insurance is NOT covered by the Pennsylvania Insurance Guaranty Association.

ITEM 1.   Named Insured:    THE BALLINGER COMPANY

Address:   833 CHESTNUT STREET
PHILADELPHIA, PA 19107

Kevin A. Sullivan, Surplus Lines Broker
Risk Specialists Companies Insurance Agency, Inc.
PA Corporate Non-Resident Surplus Lines License #504626
100 Summer Street, Boston, MA 02110

ITEM 2.   Policy Period:
From:  02/01/2011 to:  02/01/2012
at 12:01 A.M. standard time at the address of the Insured stated above.

ITEM 3.   Limits of Liability: $5,000,000         Each Claim
                              $5,000,000         Policy Aggregate

ITEM 4.   Deductible:     $150,000               Each Claim

ITEM 5.   Premium:

A.   Total Advance Premium:              $296,639
B.   Annual Minimum Premium:             $296,639
C.   Minimum Earned Premium at Inception: $74,160

ITEM 6.   Audit Rate: Not Subject to Audit

ITEM 7.   Extended Reporting Period: 12 Month(s) at 100% of the total policy premium

ITEM 8.   Retroactive Date: FULL PRIOR ACTS

ITEM 9.   Endorsements made a part of this policy:  See attached Forms Schedule

Transaction #:   3206-021456755
Premium:         296,639
Premium Tax:     8,899.17
Filing Fee:      25.00
TOTAL:           305,563.17

_David Bresnahan_

Authorized Representative OR
Countersignature (In states where applicable)

CM-PL1 (Ed.03/04)
LX0423

FORMS SCHEDULE

Named Insured:  THE BALLINGER COMPANY

Policy No:  021456755                                    Effective Date:   02/01/2011

| Form Number | Edition Date | Endorsement Number | Title |
|---|---|---|---|
| LEXCM-PL-1 | 03/04 | | A&E PROF LIABILITY W/DED |
| LX8531 | 12/09 | | A&E PROF LIAB W/DED TXT |
| LEXCME077 | 03/86 | 001 | MINIMUM EARNED PREMIUM |
| MANUSCRIPT | | 002 | SPECIFIC PROJECT EXCESS LIMITS |
| LX8535 | 09/09 | 003 | A&E PROF LIAB RISK MGMT SERV'S |
| MANUSCRIPT | | 004 | TECHNOLOGY SERVICES AMENDATORY |

DOC018(Ed.12/87)
LX0295

## POLICYHOLDER NOTICE

Thank you for purchasing insurance from the Chartis companies.  Chartis insurance companies generally pay compensation to brokers and independent agents, and may have paid compensation in connection with your policy.  You can review and obtain information about the nature and range of compensation paid by Chartis insurance companies to brokers and independent agents in the United States by visiting our website at www.chartisinsurance.com/producercompensation  or by calling 1-800-706-3102.

91222 (12/09)

# LEXINGTON INSURANCE COMPANY

**Administrative Offices: 100 Summer Street, Boston, Massachusetts 02110-2103**

ARCHITECTS AND ENGINEERS PROFESSIONAL LIABILITY

NOTICE

THIS POLICY PROVIDES CLAIMS MADE AND REPORTED COVERAGE, THE POLICY APPLIES ONLY TO CLAIMS MADE UPON THE INSURED AND REPORTED IN WRITING TO THE COMPANY DURING THE SAME POLICY PERIOD OR EXTENDED REPORTING PERIOD, IF APPLICABLE.

THE LIMIT OF LIABILITY AVAILABLE TO PAY JUDGEMENTS OR SETTLEMENTS SHALL BE REDUCED BY AMOUNTS INCURRED FOR CLAIM EXPENSES. FURTHER NOTE THAT AMOUNTS INCURRED FOR CLAIM EXPENSES SHALL BE APPLIED AGAINST THE DEDUCTIBLE AMOUNT.

VARIOUS PROVISIONS THROUGHOUT THIS POLICY RESTRICT OR EXCLUDE COVERAGE. PLEASE READ THE ENTIRE POLICY CAREFULLY TO DETERMINE THE INSURED'S RIGHTS AND DUTIES, AND WHAT IS AND IS NOT COVERED.

DEFINED TERMS APPEAR IN BOLD-FACED TYPE.   PLEASE REFER TO SECTION III. DEFINITIONS

In consideration of the payment of the premium by the **Named Insured** and in reliance upon the statements in the **Insured's** application incorporated herein by reference, the **Company** agrees with the **Insured** subject to all of the terms and conditions of this policy, as follows:

## I.   INSURING AGREEMENTS

**A.   COVERAGES: (CLAIMS-MADE AND REPORTED)**

The **Company** will pay on behalf of the **Insured** those sums in excess of the deductible shown in Item 4 of the Declarations that the **Insured** shall become legally obligated to pay as **Damages** because of **Claims** for a **Breach of Professional Duty** in the performance of **Professional Services** rendered to others by the **Insured** or any entity for whom the **Insured** is legally liable.

For this coverage to apply, all of the following conditions must be satisfied:

1. The **Breach of Professional Duty** forming the basis of any **Claim** must arise out of **Professional Services** that take place subsequent to the Retroactive Date shown in Item 8 of the Declarations and prior to the end of the **Policy Period**.

2. Prior to the effective date of this policy, no officer, director, principal, partner, insurance manager, risk manager or corporate counsel of the **Insured** had knowledge of the **Breach of Professional Duty** or circumstance likely to give rise to a **Claim** under this policy. If such officer, director, principal, partner, insurance manager, risk manager or corporate counsel of the **Insured** knew, prior to the effective date of this policy, of the **Breach of Professional Duty** or a circumstance likely to give rise to a **Claim** under this policy, then any continuation, change or resumption of such **Breach of Professional Duty** or circumstance during or after this **Policy Period** will be deemed to have been known prior to this **Policy Period**.

3. **Claim** must first be made against the **Insured** during the **Policy Period**.

4. The **Insured** must report the **Claim** to the **Company**, in writing, during the **Policy Period** or within the sixty (60) day period immediately following the end of the **Policy Period**.

B.   **TERRITORY**

The insurance afforded by this policy applies only to Claims arising out of a Breach of Professional Duty in the performance of Professional Services that take place in and result in a Claim brought within:

1. the United States of America, its territories or possessions or Puerto Rico; and

2. elsewhere in the world.

Payment of loss under this policy shall only be made in full compliance with all United States of America economic or trade sanction laws or regulations, including, but not limited to, sanctions, laws and regulations administered and enforced by the U.S. Treasury Department's Office of Foreign Assets Control (OFAC).

C.   **DEFENSE PROVISIONS**

1. When any Claim against the Insured for which coverage is provided under this policy is made or brought within the United States of America, its territories or possessions, or Puerto Rico, the Company has the right to investigate such Claim, and the duty to defend such Claim with defense counsel selected with the Company's approval, even if such Claim is groundless, false or fraudulent. The Company's obligation to defend or to continue to defend any Claim as provided in this subsection 1. shall end when the applicable limit of the Company's liability has been exhausted by payment of Claim Expenses or Damages or both.

2. When any Claim against the Insured for which coverage is provided under this policy is made or brought outside the areas described in subsection 1. above, the Company shall not be obligated to assume charge of the investigation, defense or settlement of such Claim but the Company shall have the right and shall be given the opportunity to associate with the Insured in the investigation and defense of such Claim. The Insured shall, under the Company's supervision, make or cause to be made such investigation and defense as is reasonable under the circumstances. Subject to prior written authorization by the Company, the Insured may also effect settlement. The Company shall reimburse the Insured for Damages and the reasonable and necessary costs of investigating and defending any such Claim such as (1) fees charged by any attorney selected by the Insured to defend the Claim, and (2) all other fees, costs and expenses resulting from the investigation, adjustment, defense and appeal of a decision regarding the Claim as authorized by the Company. For purposes of computing the amount of the limits of liability and deductible amount under this policy, such reasonable costs shall be construed as Claim Expenses. The Company's obligations under this subsection 2. Shall end when the applicable limit of liability has been exhausted by the payment of Claim Expenses or Damages or both.

D.   **SETTLEMENT PROVISIONS**

The Company will not settle or compromise any Claim without the consent of the Insured. If, however, the Insured refuses to consent to a settlement or compromise recommended by the Company and elects to contest such Claim or continue legal proceedings in connection with such Claim, then the Company's liability for the Claim shall not exceed the amount for which the Claim could have been so settled plus Claim Expenses incurred up to the date of such refusal subject to the applicable limit of liability under this policy.

E.   **CLAIM EXPENSES**

Claim Expenses shall be paid by the Company, and such payments reduce the available limit of liability. The Insured must first pay any applicable deductible amounts as shown forth in Item 4 of the Declarations. Claim Expenses shall also be applied to the deductible.

## II.   EXCLUSIONS

This policy does not provide coverage and the Company will not pay Claim Expenses or Damages for any Claim based upon or arising out of:

A.      any dishonest, fraudulent, criminal or malicious conduct or Breach of Professional Duty or conduct of a knowingly wrongful nature committed intentionally or at the direction of an Insured; however, the Company shall defend a Claim against an Insured who did not commit, participate in, or have knowledge of the dishonest, malicious, or criminal acts or omissions, except the Company shall not defend any criminal prosecution under any circumstances;

B.      any Claim made by any Insured against any other Insured;

C.      the actual or alleged: (1) Wrongful Termination; (2) Discrimination; or (3) Sexual Harassment of any past or present employee of the Insured;

D.      any Insured's involvement as a partner, officer, director, stockholder, employer or employee of any business enterprise not named in the Declarations;

E.      any Insured's involvement in or Professional Services rendered to or on behalf of any organization or subsidiary or affiliate thereof, not named in the Declarations: (1) that wholly or partly owns, or to any extent controls, operates or manages an Insured, or (2) in which an Insured has a greater than 25% ownership, or (3) that is controlled, operated or managed by an Insured;

F.      the design or manufacture of any products developed by any Insured for multiple sale or mass distribution, including but not limited to computer programs or software; however, this exclusion shall not apply to software created or modified specifically for a client for whom the Insured is rendering Professional Services;

G.      any express warranty or guarantee unless liability would have attached to the Insured in the absence of an express warranty or guarantee and such liability arises out of a Breach of Professional Duty by the Insured in the performance of Professional Services;

H.      the cost to repair or replace any faulty: workmanship, assembly, construction, erection, fabrication, installation or remediation;

I.      the liability of others assumed by any Insured under any contract or agreement unless such liability arises as a result of a Breach of Professional Duty by the Insured in performance of Professional Services and would have existed absent such contract;

J.      Bodily Injury sustained by any employee of any Insured while engaged in employment by any Insured, or (1) any Claim by any person on account of such injury whose right to assert the Claim arises by reason of any blood, marital or other relationship with the employee, or (2) any Claim by any person or entity seeking contribution or indemnity because of such injury except that this exclusion does not apply to liability arising under a written contract executed prior to the injury;

K.      any obligation of any Insured under any worker's compensation, disability benefits or unemployment compensation law or any similar laws;

L.      nuclear reaction, radiation or contamination, under any circumstances and regardless of cause, within or originating from a Nuclear Facility;

M.      1. war, including undeclared or civil war; or

           2. warlike action by a military force, including action in hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or

3. insurrection, rebellion, revolution, usurped power, or action taken by governmental authority in hindering or defending against any of these.

This exclusion does not apply to a certified act of terrorism defined by Section 102. Definitions, of the Terrorism Risk Act of 2002 and any revisions or amendments thereto.

N.   services as an **Agency Construction Manager** with respect to any project for which any **Insured** holds any contract to perform any construction, erection, assembly, fabrication, installation or remediation either by itself or through any subcontractor at any tier. This exclusion shall not apply to the provision of other **Professional Services** by the **Insured** or any entity for which the **Insured** is legally liable.

O.   any deductible amount, self-insured retention or other retained amount for which any **Insured** has assumed or incurs any obligation for **Damages, Claim Expenses** or any other liability under any professional liability insurance policy or combined professional liability and pollution liability policy applying or purporting to apply to a specific project.

### III.   DEFINITIONS

A.   **Agency Construction Manager** means a person or organization that provides professional consulting services to a project owner for a fee to assist in the oversight of a project and the progress of the design and construction process.

B.   **Bodily Injury** means physical bodily injury, sickness or disease sustained by a person, including death at any time resulting from any of these.

C.   **Breach of Professional Duty** means negligence, defined as the failure to meet the professional standard of care legally required or reasonably expected under the circumstances in the performance or non-performance of **Professional Services** rendered to others by the **Insured** which results in **Damages** for which the **Insured** is legally liable.

D.   **Claim** means any demand received by an **Insured** seeking **Damages** and alleging liability or responsibility on the part of the **Insured** or persons for whose conduct the **Insured** is legally liable.

E.   **Claim Expenses** means:

1.   fees charged by any attorneys designated and approved by the **Company** for services in connection with the investigation or defense of **Claims**;

2.   all other fees, costs and expenses resulting from the investigation, adjustment, defense and appeal of a **Claim**, if authorized by the **Company**.

3.   **Claim Expenses** shall not include the salaries of any employee of the **Company** or of the **Insured**.

F.   **Company** means the Lexington Insurance **Company**.

G.   **Damages** means any amount which an **Insured** is legally obligated to pay for any **Claim** to which this insurance applies and shall include: judgments and settlements, interest on judgments, and punitive, exemplary or multiple **Damages**, provided always that **Damages** shall not include the return or withdrawal of professional fees, sanctions, fines or penalties imposed by law. **Damages** shall not include matters that may be deemed uninsurable under the law pursuant to which this policy shall be construed. **Damages** also shall not include **Liquidated Damages** except for liability the **Insured** would have had in the absence of such **Liquidated Damages**.

H.   **Discrimination** means termination of an employment relationship or a demotion or a failure or refusal to hire or promote any individual because of race, color, religion, age, sex, disability, pregnancy, national origin or sexual orientation.

I.  **Insured** means:

1.  the **Named Insured** designated in Item 1 of the Declarations;

2.  any person who is or was a partner, officer, director, stockholder or employee of the **Named Insured** but only while acting within the scope of his/her duties as such;

3.  the heirs, executors, administrators, and legal representatives of each **Insured** as defined in 1. and 2. above, in the event of death, incapacity or bankruptcy of such **Insured**, but only as respects liability arising out of **Professional Services** rendered by or on behalf of the **Named Insured** prior to such **Insured's** death, incapacity or bankruptcy;

4.  a former partner, officer, director or employee of the **Named Insured** while rendering **Professional Services** on behalf of the **Named Insured**;

5.  contract or leased personnel rendering **Professional Services** under the supervision of and on behalf of the **Named Insured**;

6.  joint ventures in which the **Named Insured** is named as a co-venturer, but only as respects the **Insured's** legal liability arising out of the **Insured's** participation in such joint venture;

7.  any **Predecessor in Interest**.

J.  **Liquidated Damages** means an amount stipulated in advance in a contract to be the amount or measure of damages to be recovered by a party to that contract if the other party breaches the agreement or fails to perform or perform adequately its obligations under the contract.

K.  **Mediation** means non-binding intervention by a qualified, professional mediator.

L.  **Named Insured** means the person or entity designated as such in Item 1 of the Declarations.

M.  **Nuclear facility** means the site at which a nuclear reactor is located or where nuclear waste or material is disposed of or stored.

N.  **Policy Period** means the period from the effective date of this policy to the expiration date or earlier termination date, if any, of this policy.

O.  **Predecessor in Interest** means any prior entity whose assets, partners, principals or shareholders have been acquired by the **Insured** and whose name has been listed in the application attached hereto, and for whose insurance the **Insured** is responsible by written agreement.

P.  **Professional Services** means those services that the **Insured** is legally qualified to perform for others in their capacity as an architect, engineer, land surveyor, landscape architect, **Agency Construction Manager**, scientist, technical consultant, including such services when performed on projects seeking LEED certification and/or utilizing Building Information Modeling (BIM) or as specifically defined by endorsement to this policy. **Professional Services** shall not include actual facility operation and maintenance operations.

Q.  **Sexual Harassment** means unwelcome sexual advances or requests for sexual favors or other verbal or physical conduct of a sexual nature that

1.  are made a condition of employment or

2.  are used as a basis for employment decisions or

3.  create a work environment that interferes with performance.

R. **Subsidiary** means any entity, in which more than 50% of the outstanding securities or voting rights representing the present right to vote for the election of directors in such entity is owned or controlled, directly or indirectly, in any combination, by the Named Insured.

S. **Wrongful Termination** means termination of an employment relationship in a manner which is against the law and wrongful or in breach of an express or implied agreement to continue employment.

## IV.    LIMITS OF LIABILITY AND DEDUCTIBLE

### A.    LIMIT OF LIABILITY-EACH CLAIM

Subject to B. the Limit of Liability-Aggregate, below, the liability of the **Company** for each covered **Claim** shall not exceed the amount stated in Item 3 of the Declarations for Each Claim. This limit is the maximum amount of **Damages** or **Claim Expenses** or both that the **Company** will pay for each covered **Claim**. The limit of liability shall apply in excess of the deductible.

### B.    LIMIT OF LIABILITY-AGGREGATE

Subject to A. Limit of Liability - Each **Claim**, above, the liability of the **Company** shall in no event exceed the amount stated in Item 3 of the Declarations as the Policy Aggregate as a result of all covered **Claims**. This limit is the maximum amount of **Damages** or **Claim Expenses** or both that the **Company** will pay under this policy for all covered **Claims** including those reported as provided for in SECTION V. CONDITION C. Extended Reporting Period, if applicable.

Once the applicable limits of liability have been exhausted, the **Company** will not defend or pay **Damages** or **Claim Expenses** for any **Claim**.

### C.    MULTIPLE INSUREDS

The number of **Insureds** covered by this policy shall not operate to increase the limits of liability as specified above.

### D.    MULTIPLE CLAIMS

Two or more covered **Claims** arising out of a single **Breach of Professional Duty** or any series of related **Breaches of Professional Duty** will be considered a single **Claim** and shall be deemed to be made at the time the first of such **Claims** is made. This policy shall only apply if the first or earliest **Claim** arising from such **Breach of Professional Duty** or series of related **Breaches of Professional Duty** is made during the **Policy Period** or Extended Reporting Period, if applicable. These provisions apply regardless of the number of **Insureds** involved in such a **Claim**, the number of **Claims** made, or the number of people or organizations that make the **Claims**.

The number of **Claims** made or the number of people or organizations that make **Claims** shall not operate to increase the Limits of Liability as specified in subsections A and B above.

### E.    DEDUCTIBLE - EACH CLAIM

The deductible amount stated in the Declarations applies to each **Claim** and shall be paid by the **Insured**. The deductible shall be applied to the payment of **Damages** or **Claim Expenses** or both.

The **Company** may advance payment for part or all of the deductible amount and, upon notification of such payment made, the **Insured** must promptly reimburse the **Company** for the deductible amounts advanced by the **Company**.

Until a **Claim** is made, the deductible does not apply to **Claim Expenses** incurred by the **Company** or at the **Company's** specific request as respects possible **Claims** reported under SECTION V. CONDITIONS B. REPORTING OF POTENTIAL **CLAIMS**.

F.    **REIMBURSEMENT:**

The Company will reimburse the Insured, upon written request, for loss of earnings by the Insured as a result of being required to attend, at the Company's request, a mediation, arbitration, deposition, or trial related to a covered Claim, subject to the following:

1.   No reimbursement will apply to the first three (3) days attendance of the Insured required for each Claim;

2.   Loss of earnings reimbursement will not be considered as payment of a Claim or Claim Expenses and will be in addition to the limits of liability.  Reimbursement is not subject to the deductible.

3.   Loss of earnings reimbursement shall not exceed $400 per day per loss of earnings Claim, subject to a maximum annual aggregate reimbursement of $7,500 for all loss of earnings Claims.

G.    **MEDIATION:**

If the Insured and the Company jointly agree to utilize Mediation as a means to try to resolve a Claim made against the Insured, and if such Claim is resolved through the use of Mediation, then the Insured's deductible payment for such Claim shall be 50% of the amount of the Insured's Deductible shown in the Declarations applicable to such Claim, subject to a maximum reduction of $20,000 for such Claim. The Company shall reimburse the Insured for any applicable deductible payment made in excess of such amount prior to the Mediation as soon as practicable after the conclusion of the Mediation.

## V. CONDITIONS

A.    **INSURED'S DUTIES WHEN THERE IS A CLAIM**

As a condition precedent to the right of coverage under this policy, the Insured must do the following:

1.   If a Claim to which this policy applies is made against the Insured, give written notice, as soon as practicable, containing the information detailed in CONDITION B., below, to:

> Lexington Insurance Company
> 100 Summer Street
> Boston, Massachusetts 02110-2103
> Attn: Claim Department
> LexingtonAEClaims@Chartisinsurance.com

Written notice shall include every demand, notice, summons or other process received by the Insured or the Insured's representatives.

2.   The Insured must cooperate with the Company and, upon the Company's request, submit to examination and interrogation by a representative of the Company, under oath if required, and shall attend hearings and depositions and shall assist the Company in the investigation, settlement and defense of Claims or suits as well as the giving of a written statement or statements to the Company's representatives all without charge to the Company.

3.   If the Insured has the right to either accept or reject arbitration of any Claim, exercise such right only with the written consent of the Company.

4.   Not make any payment, admit any liability, settle any Claims or assume any obligations without the prior written consent of the Company.

5.   Do whatever is necessary to secure and affect any rights of indemnity, contribution or apportionment that the Insured may have.

6    Other than what is required by law, refrain from discussing the facts and circumstances of any Claim with anyone other than legal counsel representing the Insured or representatives of the Company.

## B.   REPORTING OF A POTENTIAL CLAIM

If the Insured first becomes aware during the Policy Period of an actual or alleged Breach of Professional Duty or circumstance arising out of Professional Services which is reasonably likely to result in a Claim, the Insured may give written notice to the Company containing the information listed below. If such written notice is received by the Company prior to the end of the Policy Period, any Claims subsequently made against the Insured arising out of such conduct shall be deemed for the purpose of this policy to have been made on the last day of the Policy Period. The Insured shall cooperate fully with the Company, and any investigation conducted by the Company or its authorized representatives, and shall be subject to the terms set forth in SECTION V. CONDITIONS A. INSURED'S DUTIES WHEN THERE IS A CLAIM above as applicable to a Claim.

It is a condition precedent to the coverage afforded by this policy that the written notice shall contain the following information:

1.   The actual or alleged Breach of Professional Duty or circumstance which is the subject of a potential Claim;

2.   A description of the Professional Services rendered by the Insured which may result in the Claim;

3.   The date(s) of such conduct which may result in the Claim; and

4.   A description of the injury or damage that has or may result in a Claim.

5.   The identities and address of any potential claimant(s);

6.   The anticipated location(s) of any such potential Claim;

7.   The circumstances by which the Insured first became aware of the potential Claim.

If all of the above information is not so provided or is, in the reasonable judgement of the Company, deemed inadequate, the Company shall inform the Insured that any Claim made after the Policy Period relating to the written notice will not be deemed to have been made during the Policy Period.

## C.   EXTENDED REPORTING PERIOD

If this policy is canceled or non-renewed by the Company or the Named Insured for reasons other than non-payment of premiums or non-compliance with the terms and conditions of this policy, the Named Insured shall have the option to purchase an Extended Reporting Period by advising the Company in writing, as provided below, of its election to do so, accompanied by the payment of the additional premium specified in Item 7 of the Declarations. The Extended Reporting Period will apply only to Claims first made against the Insured during the number of months specified in Item 7 of the Declarations following immediately upon the effective date of such cancellation or non-renewal, but only by reason of a Breach of Professional Duty arising out of Professional Services which happens subsequent to the retroactive date and prior to the effective date of such cancellation or non-renewal, and which is otherwise covered by this policy. This Extended Reporting Period, if purchased, must be endorsed hereto.

If however, this policy is immediately succeeded by similar claims-made insurance coverage issued

by any insurer for which the retroactive date is the same as or earlier than that shown in Item 8 of the Declarations, the succeeding insurance shall be deemed to be a renewal hereof and the Named Insured shall have no right to an Extended Reporting Period.

The quotation of a different premium or deductible amount or limit of liability or differing terms and conditions for renewal does not constitute a refusal to renew for the purpose of this provision.

As a condition precedent to the Named Insured's right to purchase the Extended Reporting Period, the Named Insured must have satisfied all conditions of this policy and must have paid all premiums and deductible amounts due.

The Named Insured's right to purchase the Extended Reporting Period must be exercised by notice, in writing, not later than sixty (60) days after the cancellation or expiration date of this policy and must include payment of the entire premium for the Extended Reporting Period as specified in Item 7 of the Declarations. If such notice and payment are not so given to the Company, the Named Insured shall not be able to purchase an Extended Reporting Period subsequently.

The Extended Reporting Period shall be non-cancelable. Accordingly, at the commencement of any Extended Reporting Period, the entire premium shall be considered earned.

The purchase of the Extended Reporting Period provision shall not reinstate the Policy Aggregate Limit or otherwise increase the Limits of Liability set forth in Item 3 of the Declarations.

## D.   SUBROGATION

In the event of any payment under this policy, the Company shall be subrogated to all the Insured's rights of recovery therefor against any person or organization and the Insured shall execute and deliver instruments and papers and do whatever else is necessary to secure such rights. The Insured shall do nothing after an incident reasonably likely to give rise to a Claim to prejudice such rights. The Company agrees to waive this right of subrogation against the client of the Insured to the extent that the Insured had, prior to a Claim, a written agreement to waive such rights.

## E.   HOW OTHER INSURANCE APPLIES

Where other insurance is available to the Insured for Damages covered under the terms and conditions of this policy, the  Company's obligation to the Insured shall be as follows:

1. This policy shall apply as excess insurance over any other valid insurance, whether collectible or not, be it primary, excess or contributing. This excess insurance shall in no way be increased or expanded as a result of the receivership, insolvency, or inability to pay of any insurer with respect to both the duty to indemnify and the duty to defend. This also applies to the Insured while acting as a self-insured for any coverage.

2. Where, in accordance with paragraph 1, above, this policy is excess insurance, the Company will:

   a. pay only its share of the amount of Damages and Claims Expenses, if any, that exceed the total amount of all such valid insurance, whether collectible or not, including any deductible, self-insured retention or other retained amount; and

   b. pay only for such Damages and Claims Expenses as are covered by the terms and conditions of this policy.

The Insured shall promptly, upon request of the Company, provide the Company with copies of all policies potentially applicable, whether collectable or not, against the liability covered by this policy.

**F.   CHANGES MADE TO THIS POLICY**

Notice to any agent or knowledge possessed by any agent or by any other person shall not effect a waiver or a change in any part of this policy or estop the **Company** from asserting any right under the terms of this policy. The terms and conditions of this policy cannot be waived or changed except by specific written endorsement issued by the **Company** and made part of this policy.

**G.   ASSIGNMENT OF THE INSURED'S INTEREST**

The interest of the **Insured** under this policy is not assignable to any other person or organization without the prior written consent of the **Company**.

**H.   CANCELLATION**

The **Named Insured** may cancel this policy by returning the policy to the **Company** or its authorized representatives. The **Named Insured** can also cancel this policy by written notice to the **Company** stating at what future date cancellation is to be effective. If the **Named Insured** cancels, earned premium shall be computed using the customary short rate table, subject to the Minimum Earned Premium at Inception shown in Item 5. C. of the Declarations, whichever is greater.

The **Company** may cancel this policy by written notice to the **Named Insured**, at the address last known to the **Company**. The **Company** will provide written notice at least thirty (30) days before cancellation is to be effective.

However, the **Named Insured** will only be entitled to ten (10) day's notice if the **Company** cancels because:

1.      the **Insured** has failed to pay a premium when due; or

2.      the **Insured** has failed to pay applicable deductible amounts due.

If the **Company** cancels, earned premium will be computed pro-rata, unless the **Company** cancels for the reason specified in subsections 1. or 2., above, in which case earned premium will be computed using the customary short rate table, subject to the Minimum Earned Premium at Inception shown in Item 5. C. of the Declarations, whichever is greater.

The mailing of any notice of cancellation shall be sufficient proof of notice.

The effective date of cancellation terminates the **Policy Period**. Return of unearned premium is not a condition of cancellation. The **Company** will return unearned premium subject to the Minimum Earned Premium at Inception shown in Item 5. C. of the Declarations in due course.

**I.   SOLE AGENT**

The **Named Insured** shall act on behalf of all other **Insureds**, if any, for the payment or return of premium, receipt and acceptance of any endorsement issued to form a part of this policy, and giving and receiving notice of cancellation or non-renewal.

**J.   BANKRUPTCY**

The bankruptcy, receivership or insolvency of an **Insured** or the **Insured's** estate or of any insurer shall not relieve the **Company** of any of its obligations under this policy. However, such bankruptcy, receivership or insolvency shall in no way increase the **Company's** liability under this policy nor will this insurance apply to liability directly or indirectly due to bankruptcy, insolvency, receivership, or subsequent liquidation.

**K.   APPLICATION**

The statements in the application are the **Insured's** representations and are deemed material. This policy is issued based upon the truth and accuracy of such representations. Upon the binding of coverage, the application, incorporated herein by reference, shall become part of this policy. This policy embodies all agreements existing between the **Insured** and the **Company** or any of its representatives relating to this policy.

**L.   PREMIUM and AUDIT**

a.   All premiums for this policy will be computed in accordance with the **Company's** rules and rates.

b.   If the premium for this policy is a flat premium, it is not subject to adjustment, except that additional premium may be required for any additional exposures and/or **Insureds** or as provided for in SECTION V. H. CANCELLATION.

The premium shown as the Total Advance Premium in Item 5. A. of the Declarations is a deposit premium only. If the policy is subject to audit adjustment, the actual exposure base will be used to compute the earned premium. If the earned premium is greater than the Total Advance Premium, the **Named Insured** will pay the difference to the **Company**, due and payable upon notice.

c.   The **Named Insured** must keep records of the information needed by the **Company** for premium computation, and send copies to the **Company** as requested. The **Named Insured** is responsible for the payment of all premiums and will be the payee for any return premiums from the **Company**.

d.   The **Company** may examine and audit the **Insured's** books and records at any time during the **Policy Period** and within three (3) years after the end of the **Policy Period**, as far as they relate to this policy.

**M.   ACTION AGAINST THE COMPANY**

No person or organization has a right under this policy to sue the **Company** or to join the **Company** as a party or otherwise bring the **Company** into a suit seeking **Damages** against an **Insured**, unless:

1.   all the terms and conditions of this policy have been fully complied with; and

2.   the amount of such **Damages** have been fixed or rendered certain;

a.   by final judgment against the **Insured** after trial of the issues; or

b.   the time to appeal such judgment has expired without an appeal being taken; or

c.   if appeal is taken, after the appeal has been determined; or

d.   by an agreed settlement in accordance with the terms and conditions of this policy. An agreed settlement means a settlement and release of liability executed by the claimant or the claimant's legal representative, and the **Insured**, with the written consent of the **Company**.

**N.   FALSE OR FRAUDULENT CLAIMS**

If the **Insured** reports any **Claim** knowing such **Claim** to be false or fraudulent, this policy shall become void and all insurance coverage hereunder shall be forfeited.

O.   ACQUISITIONS, MERGERS AND MATERIAL CHANGES

In the event that the Named Insured (i) acquires any other entity or acquires substantially all the assets of another entity, or (ii) merges with another entity such that the Named Insured is the surviving entity, or (iii) creates or acquires a Subsidiary or (iv) in the sole judgment of the Company materially changes its business as described in the Application after the effective date of this policy, no coverage shall be afforded under this policy for assets acquired, or the entity merged with, or the Subsidiary or such changed business activities, unless and until:

1.   The Named Insured provides written notice of such transaction or event or change to the Company not more than sixty (60) days after the effective date of such transaction, or event or change, and

2.   The Named Insured promptly provides the Company with such information in connection therewith as the Company may deem necessary, and

3.   The Named Insured accepts any special terms, conditions, exclusions, or additional premium charge required by the Company, and

4.   The Company at its sole discretion specifically agrees in writing to provide such coverage.

If the Company agrees to provide coverage, it will not include any Breach of Professional Duty committed or allegedly committed, with respect to any entity, assets, Subsidiary, or changed business activities referred to in subsection 1 above, prior to the effective date of such acquisition, merger, creation, or change, or any Breach of Professional Duty or interrelated Breaches of Professional Duty committed or allegedly committed prior to the effective date of such acquisition, merger, creation, or change.

If (i) the Named Insured merges into or consolidates with another entity, or (ii) another entity or person or group of entities and/or persons in concert acquire securities or voting rights which result in ownership or voting control by the other entity or person(s) of more than 50% of the outstanding securities representing the present right to vote for election of directors of the Named Insured, coverage under this policy shall continue until termination of this policy, but only with respect to Claims for Breach of Professional Duty committed, attempted, or allegedly committed by the Insureds prior to such merger, consolidation or acquisition. The Named Insured shall give written notice of such merger, consolidation or acquisition as soon as practicable, together with such information as the Company may require.

For purposes of this Condition, an entity shall mean any corporation, business trust, partnership, or other form of organization, including a Named Insured.

P.   SERVICE OF SUIT

In the event of failure of the Company to pay any amount claimed to be due hereunder, the Company, at the request of the Insured, will submit to the jurisdiction of a court of competent jurisdiction within the United States. Nothing in this Condition constitutes or should be understood to constitute a waiver of the Company's rights to commence an action in any court of competent jurisdiction in the United States, to remove an action to a United States District Court or to seek a transfer of a case to another court as permitted by the laws of the United States or of any state in the United States. It is further agreed that service of process in such suit may be made upon Counsel, Legal Department, Lexington Insurance Company, 100 Summer Street, Boston, Massachusetts, 02110 or his or her representative, and that in any suit instituted against the Company upon this policy, the Company will abide by the final decision of such court or of any appellate court in the event of an appeal.

Further, pursuant to any statute of any state, territory, or district of the United States which makes provision therefor, the Company hereby designates the Superintendent, Commissioner or Director of Insurance, or other officer specified for that purpose in the statute, or his or her successor or suc-

cessors in office as its true and lawful attorney upon whom may be served any lawful process in any action, suit, or proceeding instituted by or on behalf of the Insured or any beneficiary hereunder arising out of this policy of insurance and hereby designates the above named Counsel as the person to whom the said officer is authorized to send such process or a true copy thereof.

**Q.   ARBITRATION**

Notwithstanding the Service of Suit Condition above, in the event of a disagreement as to the interpretation of this policy, it is mutually agreed that such dispute shall be submitted to binding arbitration before a panel of three (3) arbitrators, consisting of two (2) party-nominated (non-impartial) arbitrators and a third (impartial) arbitrator (hereinafter "umpire") as the sole and exclusive remedy.

The party desiring arbitration of a dispute shall notify in writing the other party, said notice including the name, address and occupation of the arbitrator nominated by the demanding party. The other party shall, within 30 days following receipt of the demand, notify in writing the demanding party of the name, address and occupation of the arbitrator nominated by it. The two (2) arbitrators so selected shall, within 30 days of the appointment of the second arbitrator, select an umpire. If the arbitrators are unable to agree upon an umpire, each arbitrator shall submit to the other arbitrator a list of three (3) proposed individuals, from which list such arbitrator shall choose one (1) individual. The names of the two (2) individuals so chosen shall be subject to a draw, whereby the individual drawn shall serve as umpire.

The parties shall submit their cases to the panel by written and oral evidence at a hearing. Said hearings shall be held within thirty (30) days of the selection of the umpire unless otherwise agreed by a majority of the panel. The panel shall be relieved of all judicial formality, shall not be obligated to adhere to the strict rules of law or of evidence, shall seek to enforce the intent of the parties hereto and may refer to, but are not limited to, relevant legal principles. The decision of at least two (2) of the three (3) panel members shall be binding and final and not subject to appeal except for grounds of fraud or gross misconduct by the arbitrators. The award will be issued within 30 days of the close of the hearings. Each party shall bear the expenses of its designated arbitrator and shall jointly share with the other the expense of the umpire and of the arbitration proceeding.

The arbitration proceeding shall take place in or in the vicinity of Boston, Massachusetts. The procedural rules applicable to this arbitration, shall, except as provided otherwise herein, be in accordance with the Commercial Rules of the American Arbitration Association.

**IN WITNESS WHEREOF,** the Company has caused this policy to be executed and attested, but this policy shall not be valid unless countersigned in the Declarations by one of its duly authorized representatives.

Secretary                          President

ENDORSEMENT # 001

**This endorsement, effective 12:01 AM** 02/01/2011

**Forms a part of policy no.:** 021456755

**Issued to:** THE BALLINGER COMPANY

**By:** LEXINGTON INSURANCE COMPANY

## MINIMUM EARNED PREMIUM

It is understood and agreed that in the event of cancellation of this policy by or at the direction of the Insured, the Company shall retain a Minimum Earned Premium of $74,160.

It is further agreed that the provision regarding cancellation by the Insured is amended to read:

"If the Insured cancels this policy, earned premium will be computed in accordance with the customary short-rate table and procedure, or the Minimum Earned Premium stated herein, whichever is greater".

_David Bresnahan_

**Authorized Representative OR**
**Countersignature (In states where applicable)**

LEXCME077(Ed.03/86)
LX0082

ENDORSEMENT #  002

This endorsement, effective 12:01 AM 02/01/2011

Forms a part of policy no.:  021456755

Issued to: THE BALLINGER COMPANY

By: LEXINGTON INSURANCE COMPANY

---

## SPECIFIC PROJECT EXCESS LIMITS ENDORSEMENT

In consideration of the premium charged, it is hereby understood and agreed that Item 3. of the Declarations, "Limits of Liability", is amended by the addition thereto of the following limits:

The Specific Project Excess Limits of Liability shall apply to the Specifc Project listed below:

$5,000,000 <u>EACH CLAIM</u>                    $5,000,000 <u>AGGREGATE</u>

Total Limits of Liability stated in Item 3. of the Declarations in the Annual Aggregate shall be $10,000,000.

The Specific Project Excess Limits of Liability shall apply:

1)      Only to a claim made first against the Insured and reported during the policy period arising out of the Specific Project described below and

2)      Only in the event that the respective Limits of Liability stated in Item 3. of the Declarations for Each Claim and Annual Aggregate prior to the amendment provided by this Endorsement have been exhausted by payment of claim expenses or damages or both for covered claims either arising out of the Specific Project described below, or otherwise under this policy.

Section IV. of this policy, LIMITS OF LIABILITY AND DEDUCTIBLE, is hereby amended as follows:

1)      Subsections C., D., and E. are redesignated as subsections D., E., and F., rspectively.

2)      The following is inserted as a new subsection C.:

C.      SPECIFIC PROJECT EXCESS LIMITS OF LIABILITY

        In the event that the respective Limits of Liability for Each Claim and Aggregate so specified in subsections A. and B. above (of this Section IV.) have been exhausted by payment of claim expenses or damages or both for covered claims either arising out of the Specific Project described in the Specific Project Excess Limits Endorsement to this policy, or otherwise under this policy, the limits of the Company's liability for claims arising solely out of the above described Specific Project shall be as follows:

A.      The Limits of Liability for Each Claim stated above for the Specific Project Excess Limits of Liability shall apply in excess of the Limit of Liability stated in Item 3. of the Declarations as applicable to Each Claim.  The liability of the Company for Each Claim arising out of the     Specific Project described below shall not exceed the excess limit of liability stated above in the

ENDORSEMENT #  002
(Continued)

Endorsement for Each Claim.   This limit is the maximum amount of claim expenses or damages or both that the Company will pay for each such claim.

B.       Subject to the Excess Limit of Liability for Each Claim described in paragraph A. above, the liability of the Company shall in no event exceed the excess limit of liability stated above in this Endorsement as Aggregate for all claims arising out of the Specific Project described below which are in excess of the Limit of Liability stated in Item 3. of the Declarations as Annual Aggregate. This limit is the total amount of claim expense or damages or both that the Company will pay under the policy for all covered claims arising out of the Specific Project described below, including those reported as provided for in subsection B. of Section V, Conditions-Claims, of this policy.

        Once the limits of liability have been exhausted, the Company will not defend, pay damages or claim expenses for any claim.

Specific Project:       Science and Engineering Complex School of Engineering and Applied
                        Sciences and Columbian College of Arts & Sciences
                        Foggy Bottom Campus

Client:                 The George Washington University
                        Washington, D. C.

Retroactive Date:       9/1/2010

All other terms and conditions of this policy remain unchanged.

_David Bresnahan_

Authorized Representative OR
Countersignature (In states where applicable)

ENDORSEMENT # 003

This endorsement, effective 12:01 AM 02/01/2011

Forms a part of policy no.:  021456755

Issued to: THE BALLINGER COMPANY

By: LEXINGTON INSURANCE COMPANY

## LEXINGTON INSURANCE COMPANY ARCHITECTS & ENGINEER'S PROFESSIONAL LIABILITY RISK MANAGEMENT SERVICES

This endorsement modifies insurance provided by the policy:

The **Company** provides the **Named Insured** with access during the **Policy Period** to Lexington Insurance Company's Architects and Engineers Professional Liability Risk Management Services (hereinafter "the Services").

The Services consist of unique value-added tools specific to the A&E industry.  A summary of the services, which include services provided by the Boston law firm of Donovan Hatem, LLP, are listed below and are further described on the password protected A&E Risk Management website located at www.lexaehelp.com (instructions for access are described below):

**Contract Review** – Donovan Hatem, LLP provides Contract Review Services free of charge. Donovan Hatem attorneys review proposed agreements between an **Insured** and an **Insured's** prospective clients. The scope of services, limitation of liability and insurance provisions of the proposed contract are all carefully analyzed. The number of free contract reviews varies based upon the Named **Insured's** firm size and is at the sole discretion of Lexington.  In most instances, turnaround can be expected within 48 hours.

**Risk Management Seminars** – Donovan Hatem, LLP present on-site Risk Management Seminars to specific individual **Insureds** or groups of **Insureds** at the sole discretion of the **Company**. Seminars are customized to the needs of the design professional **Insured**.

**Pre-Claim Prevention Services** – Upon timely notice of an **Insured's** written request to the **Company** within the **Policy Period** and upon subsequent authorization by the **Company**, Donovan Hatem, LLP provides Pre-claim or Loss Prevention advice to the **Insured** regarding issues, problems or concerns related to an incident or potential **Claim**. This service is provided at the sole discretion of the **Company**, without cost to the **Insured**, but is limited to ten thousand dollars ($10,000) for all Pre-claim and Loss Prevention advice provided for each incident or potential **Claim** reported to the **Company** during the **Policy Period** or extended reporting period, if applicable.

**Claims Management Services** – the **Company's** experienced A&E claims professionals may partner with Donovan Hatem, LLP to provide quality claims investigation and management services on behalf of design professional **Insureds** including, advice and recommendations to the **Insured** and their defense counsel.

**Website** www.lexaehelp.com – the **Company** has created a state-of-the-art Website exclusively for our design professional **Insureds**. Among some of its topics, the Website contains video seminars (eligible for CEU credits), contract guidelines, newsletters, and state by state legal issues summaries.

- Access to the Website - First, designate a password administrator who will be responsible for issuing passwords to the firm members and will have access to online usage tracking of risk management training.  Next, the designated administrator should go to www.lexaehelp.com and click on *"Current Lexington A&E Insureds click here to request a password"*.  Once the information is submitted you should receive a password within 7 to 10 business days.

The above referenced services are provided at no cost to the Named Insured and no premium has been allocated for these services.  As such, the Company reserves the right to change or discontinue these services at the Company's sole discretion and without notice to the Named Insured.

Without exception, services are only available while this policy is in force.

All other terms and conditions of the policy remain the same.

David Bresnahan
_____
**Authorized Representative OR**
**Countersignature (In states where applicable)**

ENDORSEMENT # 004

This endorsement, effective 12:01 AM 02/01/2011

Forms a part of policy no.: 021456755

Issued to: THE BALLINGER COMPANY

By: LEXINGTON INSURANCE COMPANY

## TECHNOLOGY SERVICES AMENDATORY ENDORSEMENT

**III. DEFINITIONS. P. Professional Services** is amended to include **Technology Services**.

**Technology Services** means computer or electronic information technology service performed by the **Insured** or any entity for whom the **Insured** is legally liable including but not limited to consulting, development, training, outsourcing, systems analysis, design, integration, management, web hosting, application hosting, programming and data processing.

For the purposes of this endorsement, the following additional exclusions are added:

This policy does not provide coverage and the **Company** will not pay **Claim** Expenses or **Damages** for any **Claim** based on or directly or indirectly arising out of or resulting from:

    1.  any infringement or misappropriation of any patent, trademark, trade dress, trade name, trade secret, or service mark related to **Technology Services**;
    2.  the **Insured's** cost of providing, correcting or re-performing or completing any **Technology Services**.

It is further agreed that Exclusion F. of this policy is deleted in its entirety and replaced as follows:
F.    the design or manufacture of any products developed by any **Insured** for multiple sale or mass distribution; however, this exclusion shall not apply to computer software programs, databases, applications, websites, or computer systems, (except for computer system security software of any type) created or modified specifically for a client for whom the **Insured** is rendering **Professional Services**.

All other terms and conditions remain the same.

_David Bresnahan_

Authorized Representative OR
Countersignature (In states where applicable)

# EXHIBIT B



# DECLARATIONS

### THIS INSURANCE COVERAGE IS ON A CLAIMS MADE BASIS.

COVERAGE APPLIES ONLY TO THOSE CLAIMS THAT ARE FIRST MADE AGAINST YOU AND REPORTED TO US IN WRITING DURING THE POLICY PERIOD OR OPTIONAL TAIL COVERAGE (IF PURCHASED), OR MADE AGAINST YOU DURING THE POLICY PERIOD AND REPORTED TO US IN WRITING DURING THE EXTENDED REPORTING PERIOD (IF APPLICABLE).   COVERAGE DOES NOT APPLY TO ANY WRONGFUL ACT OR POLLUTION EVENT OCCURING BEFORE THE RETROACTIVE DATE STATED IN THIS POLICY.  THE LIMITS OF LIABILITY AVAILABLE TO PAY DAMAGES OR SETTLEMENT AMOUNTS SHALL BE REDUCED AND MAY BE TOTALLY EXHAUSTED BY PAYMENT OF DEFENSE COSTS.

### PLEASE READ THIS POLICY CAREFULLY.

| | |
|---|---|
| COMPANY NAME:<br>AXIS Insurance Company<br>303 West Madison, Suite 500<br>Chicago, IL  60606 | POLICY FORM:<br>Design Professional Liability – DP 0001 (Ed. 02 11) |
| POLICY NUMBER:  MBZ765473/01/2012 | RENEWAL OF:  N/A |
| BROKER OF RECORD:<br>Insurance Innovators, Inc.<br>130 S Easton Rd.<br>Glenside, PA 19038 | BROKER CONTACT:<br>Sam Kravitz<br>215-690-0815<br>Sam@iiigroup.com |

| | | |
|---|---|---|
| Item 1. | Named Insured:<br>The Ballinger Company<br>833 Chestnut Street<br>Philadelphia, PA 19107 | Item 2.   Policy Period:<br>a.   Inception Date   2/1/2012<br>b.   Expiration Date   5/1/2013<br>*Both dates at 12:01 a.m. at the address listed in Item 1.* |
| Item 3. | Limits of Liability (inclusive of defense costs):<br>a.   Each Claim<br>b.   Aggregate Limit of Liability for all Claim(s)<br>during the **Policy Period** | $5,000,000<br><br>$5,000,000 |
| Item 4. | Deductible (inclusive of defense costs):<br>Each Claim | $150,000 |
| Item 5. | Retroactive Date:<br>01/01/1898 | Item 6.   Premium:<br>a.   Total Policy Premium        $356,708<br>b.   Surcharges and Assessments<br>(included in Total):        $0.00 |
| Item 7. | Endorsements Attached at Inception: | See attached Schedule of Forms and Endorsements |



## DECLARATIONS

Item 8.   Notices to Insurer:

<u>Notice of **Claim(s)** To Be Sent To:</u>
AXIS
Claim Department
11680 Great Oaks Way, Suite 500
Alpharetta, Georgia 30022
Email: USClaimNoticeATL@axiscapital.com
FNOL Electronic Fax: 1-866-770-5629

<u>All Other Notices To Be Sent To:</u>
AXIS
Design Professional & Environmental
Connell Corporate Park
300 Connell Drive, Suite 2000
Berkeley Heights, NJ  07922
Fax:  (908) 508-4301

DP 0003 (Ed. 01 11)

# Schedule of Forms and Endorsements

| COMPANY: AXIS Insurance Company | |
|---|---|
| **POLICY NUMBER:** MBZ765473/01/2012 | **RENEWAL OF:** N/A |
| **NAMED INSURED**<br>Name:   The Ballinger Company<br>Address:   833 Chestnut St<br>            Philadelphia, PA 19107 | **BROKER OF RECORD**<br>Name:        Insurance Innovators, Inc.<br>Address:     130 S Easton Road<br>              Glenside, PA 19038 |

| Form Number | Title | Endorsement Number |
|---|---|---|
| DP 0003 (Ed. 01 11) | Declarations Page | |
| DE 0001 (Ed. 01 11) | Schedule of Forms and Endorsements | |
| DP 0001 (Ed. 02 11) | Design Professional Liability Policy | |
| DE 2004 (Ed. 11 10) | AXIS Insurance Signature Page | |
| DE 0010 (Ed. 12 10) | OFAC Notice | |
| DP 2133 (Ed. 01 11) | Pennsylvania Amendatory Endorsement | 1 |
| DP 0021 (Ed. 11 10) | Construction Management and Design Build Endorsement | 2 |
| DP 0017 (Ed. 11 10) | Amendment of Section I.B.3 Defense and Settlement | 3 |
| DP 0024 (Ed. 11 10) | Specific Project Excess | 4 |
| DP 0030 (Ed. 11 10) | Manuscript Endorsement – Basic Technology Services | 5 |
| DP 0030 (Ed. 11 10) | Manuscript Endorsement – Mutual Choice of Counsel | 6 |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

DE 0001 (Ed. 01 11)



## Design Professional Liability Policy
## CLAIMS MADE AND REPORTED COVERAGE

**Table of Contents**

| Section | Title | Page |
|---------|-------|------|
| I. | INSURING AGREEMENT | 2 |
| II. | COVERAGE EXTENSIONS | 2 |
| III. | DEFINITIONS | 5 |
| IV. | EXCLUSIONS | 6 |
| V. | GENERAL CONDITIONS AND LIMITATIONS | 7 |



**AXIS**

Design Professional Liability Policy

THIS POLICY IS WRITTEN ON A CLAIMS MADE AND REPORTED BASIS.  COVERAGE APPLIES ONLY TO THOSE CLAIMS THAT ARE FIRST MADE AGAINST YOU AND REPORTED TO US IN WRITING DURING THE POLICY PERIOD OR OPTIONAL TAIL COVERAGE (IF PURCHASED), OR MADE AGAINST YOU DURING THE POLICY PERIOD AND REPORTED TO US IN WRITING DURING THE EXTENDED REPORTING PERIOD (IF APPLICABLE).

THE PAYMENT OF CLAIM EXPENSE REDUCES THE LIMIT OF LIABILITY; CLAIM EXPENSE SHALL BE SUBJECT TO THE DEDUCTIBLE AMOUNT.

Please read the entire Policy carefully.  Provisions and requirements contained in this Policy specify what is and what is not covered, restrict coverage, and designate your rights and duties.

Throughout this Policy the words "you" and "your" refer to the **Named Insured** shown in the Declarations, and any other person or organization qualifying as an **Insured** under this policy.  The words "we", "us" and "our" refer to the Company providing this insurance as specified in the Declarations.  Words and phrases that appear in **Bold** have special meaning as described in Policy Section **III. DEFINITIONS.**

In consideration of your payment of premium and in reliance on the statements in the application for this Policy and subject to the Declarations and all other terms of this Policy, including any endorsements hereto, we agree with you as follows:

I.   **INSURING AGREEMENT**

A.   **Coverage**

We will pay on your behalf those sums in excess of the Deductible and up to the Limit of Liability that you become legally obligated to pay as **Damages** or **Claim Expense** because of **Claims** arising out of **Wrongful Acts** or **Pollution Events** that take place on or after the **Retroactive Date** and prior to the end of the **Policy Period**, provided such **Claims** are:

1.   first made against you and reported to us in writing during the **Policy Period** or the Optional Tail Coverage (if purchased); or

2.   first made against you during the **Policy Period** and reported to us in writing during the Extended Reporting Period (if applicable).

This insurance applies only when prior to the effective date of the first policy issued to you and continuously renewed by us, no principal, partner, director, executive officer, or any person whose signature appears on any application of your shad knowledge of any act, error, omission, situation or event that could reasonably be expected to result in a **Claim**.

B.   **Defense and Settlement**

1.   We have the right and duty to defend any **Claim** to which this insurance applies, even if the allegations are groundless, false or fraudulent.  We also have the right to select counsel to defend such **Claim**.

2.   Our right and duty to defend and pay **Damages** or **Claim Expense** on your behalf ends when the applicable Limit of Liability has been exhausted by payment of **Damages** or **Claim Expense.**

3.   We may, at our discretion, investigate and settle a covered **Claim**. However, we will not settle any **Claim** without the consent of the **Named Insured**, which shall not be unreasonably withheld.

4.   No offer to settle any **Claim** shall be made or accepted by you without our prior written agreement.

II.   **COVERAGE EXTENSIONS**

A.   **Supplementary Payments**

Except as specifically noted below, payments made under this Section are not subject to the Deductible and are in addition to the Limit of Liability.



1.  Expense Reimbursement

    If we request that you attend a deposition, hearing, **Mediation**, arbitration or trial in connection with the defense of a **Claim**, we will reimburse you for your actual loss of earnings and reasonable expenses up to $500 per day per person, but no more than $10,000 in total for each **Policy Period**. Reimbursement will be made upon your written request, which shall include documentation adequate to support the expense amount requested.

2.  Regulatory Actions Reimbursement

    We will reimburse you for legal fees and expenses that you incur with our prior written consent in responding to a regulatory or administrative action brought directly against you by a government agency under the:

    a.  Americans with Disabilities Act of 1990 (ADA);
    b.  Fair Housing Act (FHA);
    c.  Occupational Safety and Health Act (OSHA);

    or any similar law or legislation of any state, provided that the regulatory or administrative action:

    a.  arises out of **Professional Services**;
    b.  is first commenced during the **Policy Period**; and
    c.  is reported to us during the **Policy Period** and prior to you incurring any legal fees or expenses.

    We will not reimburse you for any fines, taxes, or penalties. The maximum we will pay under this provision is $25,000 per **Policy Period**. Any additional amounts will be considered **Claim Expense** and will be subject to the Deductible and will erode the Limit of Liability. Reimbursement will be made upon your written request, which shall include documentation adequate to support the expense amount requested.

3.  Mediation

    If we and you agree to use **Mediation** to resolve a **Claim** brought against you, and we approve of the **Mediation** process and forum in writing prior to such **Mediation**, and if such **Claim** is resolved thereby, the Deductible stated in the Declarations shall be reduced by 50% for such **Claim**, subject to a maximum reduction of $25,000.

B.  **Pre-Claim Assistance and Circumstance Reporting**

1.  Pre-Claim Assistance

    If you become aware of a **Circumstance** and you give notice to us of such **Circumstance** in accordance with paragraph 2. below, we at our sole discretion may elect to investigate the reported **Circumstance**. Until a **Claim** that arises from the reported **Circumstance** is made, we will be responsible for any costs we incur for the investigation of such **Circumstance**.

2.  Circumstance Reporting

    If during the **Policy Period** you become aware of a **Circumstance** and give notice to us of:

    a.  the facts and situation surrounding the **Circumstance**, including any associated actual or alleged **Wrongful Act**;

    b.  the Damages which have or may result from the **Circumstance**; and

    c.  how and when you first became aware of the **Circumstance** and any associated actual or alleged **Wrongful Act**;

    then any **Claim** for which coverage is provided by this Policy that may be made against you arising out of the **Circumstance** shall be deemed for the purposes of this insurance to have been made on the date on which the notice was given to us.

C.  **Estates, Legal Representation, Assigns, Spouses and Domestic Partners**

    The estates, legal representatives, assigns, spouses and domestic partners of natural person **Insureds** shall be considered **Insureds** under this Policy, but only for **Claims** arising solely out of their status as such and in case of spouses or domestic partners, out of their ownership interest in property from which the claimant seeks



recovery for such **Insured's Wrongful Acts**. The coverage extension afforded by this subsection does not apply to any **Claim** alleging a wrongful or negligent act, error, or omission by any such heir, legal representative, assign, spouse or domestic partner. All terms and conditions of this Policy applicable to **Damage and Claim Expense** incurred by such **Insureds** shall apply to loss incurred by such heirs, legal representatives, assigns, spouses or domestic partners.

The term "domestic partner" as used in this subsection shall include any natural person qualifying as a domestic partner by law.

**D. New Subsidiaries**

If, after the Inception Date of this Policy, you directly or indirectly form or acquire any entity in which you own more than fifty percent (50%) of the issued and outstanding voting equity securities; or control voting rights representing the present right to vote for election; or appoint more than fifty percent (50%) of the directors or trustees:

1. Coverage under this Policy shall automatically apply to such entity, but only for **Wrongful Acts** committed after the formation or acquisition date thereof, unless paragraph 2. below applies.

2. If such entity's annual gross revenues exceed ten percent (10%) of your annual gross revenues at the Inception Date of this Policy, the coverage provided in paragraph 1. above shall not extend beyond ninety (90) days from the formation or acquisition date unless paragraph 3. below applies.

3. If you give written notice to us within ninety (90) days of such formation or acquisition and provide all necessary underwriting information we request, and pay any reasonable additional premium that we may require, then we may issue an endorsement adding such entity as an **Insured** under this Policy.

**E. Extended Reporting Period and Optional Tail Coverage**

1. Extended Reporting Period

If this Policy is canceled or non-renewed for any reason other than nonpayment of premium or Deductible; your failure to comply with any term or condition; fraud; or material misrepresentation; you shall be entitled to a free Extended Reporting Period of sixty (60) days from the effective date of such cancellation or non-renewal to report **Claims** first made against you during the **Policy Period**. This Extended Reporting Period may not be canceled by us and shall be included within the Optional Tail Coverage, if purchased.

2. Optional Tail Coverage

If you do not renew this policy or if we cancel or refuse to renew this Policy for reasons other than the nonpayment of premium or Deductible; your failure to comply with any term or condition; fraud; or material misrepresentation; and you do not replace this insurance with other insurance that provides design professional liability coverage, then upon the payment of an additional premium, you shall have the option to purchase Optional Tail Coverage, thereby extending the period during which a **Claim** can be made against you and reported to us.

The premium for the Optional Tail Coverage shall be (1) 100% of the annual premium for twelve (12) months of coverage, (2) 150% for twenty-four (24) months of coverage, or (3) 200% for thirty-six (36) months of coverage. The purchase of Optional Tail Coverage shall be endorsed herein.

Your right to purchase the Optional Tail Coverage shall lapse unless written notice of the option elected, along with payment of the additional premium, is mailed within thirty (30) days after the effective date of cancellation or non-renewal. If such notice and the premium are not mailed to us within thirty (30) days, then you shall not at a later date be entitled to purchase Optional Tail Coverage.

The premium for the Optional Tail Coverage period shall be deemed fully earned at its inception. **Claims** first made during the Optional Tail Coverage shall be deemed to have been made during the **Policy Period**. Optional Tail Coverage shall apply only to **Wrongful Acts** that occurred on or after the **Retroactive Date** and prior to the effective date of cancellation or nonrenewal of the Policy.

The Limit of Liability for the Optional Tail Coverage period shall be part of and not in addition to the Limit of Liability set forth in Item 3. of the Declarations.



### III.  DEFINITIONS

A.  **Bodily Injury** means physical injury to the body or sickness or disease sustained by a person, including: death, mental injury, mental anguish, emotional distress, shock or fright, resulting therefrom.

B.  **Circumstance** means any incident or event that takes place during the **Policy Period**, and from which you reasonably expect that a **Claim** could arise.

C.  **Claim** means any demand received by you seeking **Damages** or **Professional Services** and alleging liability or responsibility on your part.

D.  **Claim Expense** means expense incurred by us, or you with our consent, in the investigation, adjustment, negotiation, arbitration, **Mediation** and defense of covered **Claims**, whether paid by us or you with our consent. **Claim Expense** includes:

   1.  attorneys fees;

   2.  costs assessed against you in any suit defended by us; and

   3.  premiums for appeal bonds or bonds to release attachments; however, we have no obligation to furnish these bonds.

   **Claim Expense** does not include:

   1.  loss of earnings, except as provided in Section **II.A.1.** of this Policy; and

   2.  salaries or other compensation paid to any **Insured** or our regular employees or officials or fees and expenses of independent adjusters retained by us.

E.  **Cleanup Costs** means the necessary expenses incurred in the investigation, removal, and remediation (including the associated monitoring, neutralization, immobilization and disposal) of contaminated soil, surface water, groundwater, or other contamination caused by a **Pollution Event**.

F.  **Construction Manager** means a person or legal entity that provides construction expertise in the form of:

   1.  recommendations to the owner and design professional(s) during the planning, design, construction and post-construction phases;

   2.  scheduling of construction; or

   3.  overall coordination of consultants and contractors during the construction.

G.  **Damages** means:

   1.  monetary judgments, awards or settlements, including those that are actual, statutory, punitive, multiplied or exemplary, if allowed by law in the applicable jurisdiction;

   2.  pre-judgment and post-judgment interest and other costs included as part of a judgment, award or settlement;

   3.  **Cleanup Costs.**

   **Damages** does not include:

   1.  fines, penalties, or taxes; or

   2.  the restitution, return, withdrawal or reduction of fees, profits, commissions or charges for services rendered or offered or any other consideration or expenses paid to you or by you for services or products.

H.  **Insured** means:

   1.  the **Named Insured;**

   2.  your current or former principals, partners, executive officers, directors, stockholders or trustees while acting on your behalf and within the scope of their duties as such;

   3.  your current or former employees including leased personnel under your supervision, but only for acts within the scope of their employment or lease agreement;

# AXIS

4. a retired principal, partner, officer, director or employee while acting within their duties as a consultant for you.

I. **Mediation** means a formal non-binding process in which a neutral panel or third party assists the parties in resolving their dispute and reaching their own settlement. We may, at our sole option, recognize any process or forum that is presented to us for our approval, which must be evidenced by our written acceptance prior to any **Mediation** taking place.

J. **Mold** means mold, fungi, mildew and associated spores and mycotoxins.

K. **Named Insured** means the person or entity designated in Item 1. of the Declarations.

L. **Nuclear Facility** means a site where a nuclear reactor is or was located, or where nuclear or radioactive waste or material is or was disposed, processed, handled or stored.

M. **Policy Period** means the period set forth in the Declarations, or any shorter period resulting from a termination of this Policy.

N. **Pollutant** means any solid, liquid, gaseous or thermal irritant or contaminant, including **Mold**, smoke, soot, vapors, fumes, acids, alkalis, chemicals, hazardous substances, hazardous materials, and waste materials at levels in excess of those naturally occurring.

O. **Pollution Event** means the discharge, dispersal, release, or escape of any **Pollutant** into or upon land, or any structure on land, the atmosphere, or any watercourse or water body, that arises out of a **Wrongful Act** and results in **Bodily Injury** or **Property Damage**. A **Pollution Event** does not include conditions that are naturally present in the environment in the concentration or amounts discovered.

P. **Professional Services** means those services specifically described in the application which you are legally qualified to perform for others in your capacity as an:

1. architect, engineer or designer;

2. landscape architect, land surveyor or planner;

3. **Construction Manager**; or

4. Interior designer/space planner.

Q. **Property Damage** means physical injury to or destruction of tangible property including the resulting loss of use thereof due to the physical injury or destruction.

R. **Retroactive Date** means the date on or after which any alleged or actual **Wrongful Act** must have taken place in order to be considered for coverage under this Policy, as stated in the Declarations. If none is shown, the **Retroactive Date** will be the effective date of the first policy issued by us to you.

S. **Wrongful Act** means a negligent act, error or omission committed by you or any entity for which you are legally liable, including your interest in joint ventures, in the performance of **Professional Services**.

All **Wrongful Acts** that take place on or after the **Retroactive Date** and prior to the end of the **Policy Period** of the last policy we issued to you, and are related by common facts, circumstances, transactions, events and/or decisions will be treated as one **Wrongful Act**.

## IV. EXCLUSIONS

We are not obligated to pay **Damages** or **Claim Expense** or defend **Claims** for or arising directly or indirectly out of:

A. an act or omission that is dishonest, fraudulent, criminal, malicious or was intentionally committed while knowing it was wrongful, as evidenced by any judgment, final adjudication, alternate dispute resolution proceeding, or written admission by you. In such event, we shall have a right to reimbursement of any **Damages** or **Claim Expense** paid by us as a result of such **Claim** to which this exclusion applies. This exclusion does not apply to an **Insured** that did not commit, acquiesce or participate in the actions that gave rise to the **Claim**.

B. a **Claim** made by any **Insured** against any other **Insured**;

C. a **Claim** by any individual or entity or its subrogees or assignees:

# AXIS

1. that wholly or partially owns, operates or manages you; or

2. in which you have an ownership interest in excess of 49 percent; or

3. that is controlled, operated or managed by you;

D. actual or alleged wrongful termination or discrimination on any basis by you against any past or present employee, officer, or applicant for employment;

E. any obligation for which you or any carrier as your Insurer may be liable under any workers' compensation, unemployment compensation, employers liability, disability benefits law or under any similar law;

F. conduct by an individual, corporation, or partnership of which you are a partner, director, officer, member or employee, that is not designated in the Declarations or this Policy as an Insured;

G. your breach of any oral or written contract or agreement, including but not limited to express warranties or guarantees; or the liability of others assumed by you under any oral or written contract or agreement, including but not limited to hold harmless and indemnity agreements and agreements to defend others. However, this exclusion shall not apply to liability that you would have as a matter of law in the absence of such contract and that arises out of a **Wrongful Act**;

H. the design or manufacture of any goods or products for multiple sale that are sold or supplied by you, or by others under license from you;

I. the cost to repair or replace faulty construction workmanship performed by you or materials provided by you in any construction, erection, fabrication, installation, assembly or manufacturing process, including parts or equipment furnished in connection therewith;

J. nuclear reaction, radiation, or contamination, under any circumstances and regardless of cause, within or originating from a **Nuclear Facility**;

K. a **Pollution Event** on, at, under or coming from any:

1. location to which you arrange for, send or have sent materials for treatment, recycling, reclamation, storage or disposal unless endorsed onto this Policy;

2. real property or personal property owned, leased, or rented by you or by your joint venture partner.

L. any **Wrongful Act**, situation, event, transaction, circumstance or matter for which notice was given by you under any design professional or pollution liability insurance coverage prior to the Inception Date of this Policy; or any **Wrongful Act**, situation, event, transaction, circumstance or matter regardless of when occurring that is related to such prior notice.

## V. GENERAL CONDITIONS AND LIMITATIONS

### A. Action Against Us

1. No action will lie against us unless, as a condition precedent thereto, there has been full compliance with all of the terms of this Policy by all **Insureds**, and the amount of your obligation to pay **Damages** has been fully determined either by judgment or award against you after actual trial, arbitration, other dispute resolution process, or by written agreement among you, the claimant and us. Any person or organization, or the legal representative thereof, who has secured such judgment, award or written agreement, will thereafter be entitled to recover under this Policy to the extent of the insurance afforded by this Policy.

2. No person or organization will have any right under this Policy to join us as a party to any action against you to determine your liability, nor will we be impleaded by you or your legal representative.

### B. Assignment

Assignment of any interest under this Policy shall not bind us unless and until our written consent is endorsed hereon.

### C. Audit and Inspection

We may audit or inspect your books, records and operations at any time during the **Policy Period** or within three years after the termination of this Policy, to the extent they relate to the subject matter of this Policy.

DP 0001 (Ed. 02 11)



D.  **Authorization**

The **Named Insured** shall be responsible for payment of all premiums and deductibles. The **Named Insured** shall have exclusive authority to act on behalf of all other **Insureds** with respect to providing and receiving notices of cancellation or nonrenewal, receiving any return premium, and purchasing Optional Tail Coverage. In the event of a disagreement between or among any **Insureds**, the **Named Insured** shall have exclusive authority to act on behalf of all other **Insureds** with respect to negotiation of settlements and the decision to appeal or not to appeal any judgment.

E.  **Bankruptcy**

Your bankruptcy or insolvency will not relieve us of our obligation under this insurance. However, this insurance will not apply to liability directly or indirectly due to such bankruptcy, insolvency, receivership or subsequent liquidation.

F.  **Cancellation and Nonrenewal**

1.  Cancellation

    a.  The **Named Insured** may cancel this Policy by mailing or delivering advance written notice of cancellation to us or our authorized representative, stating the effective date thereof. If no effective date is stated, the effective date of cancellation shall be thirty (30) days after the date of notice. The **Policy Period** will end on that date.

    b.  We may cancel this Policy by mailing or delivering to the **Named Insured** written notice of cancellation at least:

        (1)  Ten (10) days before the effective date of cancellation if we cancel for nonpayment of premium; or

        (2)  Thirty (30) days before the effective date of cancellation if we cancel for any other reason.

    c.  If this Policy is canceled, we will send the **Named Insured** any premium refund due. If we cancel, the refund will be the pro rata unearned amount of the annual premium. If the **Named Insured** cancels, the refund, if any, will be the pro rata unearned amount of the annual premium calculated at the customary short rate. Return of premium to the **Named Insured** is not a condition precedent to cancellation.

2.  Nonrenewal

    We may elect not to renew this Policy by mailing or delivering written notice of nonrenewal to the **Named Insured** at the address shown on the Declarations Page of this Policy. We will mail or deliver the notice at least thirty (30) days before the expiration of the Policy Period.

3.  Notice

    We will deliver notice of cancellation or nonrenewal to the **Named Insured** at the address stated in Item 1. of the Declarations.  If notice of nonrenewal is mailed, proof of mailing will be sufficient proof of notice. Delivery of the notice will be the same as mailing.

G.  **Changes to the Policy**

Notice or knowledge possessed by any person will not effect a waiver or a change in any part of this Policy or prevent us from asserting any rights under the terms of this Policy; nor will the terms of this Policy be waived or changed except by written endorsement issued to form a part of this Policy.

H.  **Choice of Law and Jurisdiction**

If a dispute arises over the meaning, interpretation or operation of any term, condition, definition or provision of this Policy, you agree with us that the laws of the State of New York shall apply and that all litigation, arbitration or other form of dispute resolution shall take place in New York, New York. In the event that you agree with us to resolve the dispute by arbitration, the Commercial Arbitration rules of the American Arbitration Association shall apply.



I.   **Duties in the Event of a Claim**

   1.   If a **Claim** is made against any **Insured**, you must:

      a.   Notify us of such **Claim** in writing as soon as practicable after a principal, partner, director or executive officer of yours first learns of the **Claim**, but in no event after the expiration of the **Policy Period**, or the Extended Reporting period (if applicable), or the Optional Tail Coverage (if purchased).

      b.   Immediately send us copies of all demands, notices, summonses or legal papers received in connection with the **Claim**;

      c.   Authorize us to obtain records and other information;

      d.   Cooperate with and assist us in the investigation, settlement or defense of the **Claim**;

      e.   Upon our request, assist us in enforcing any rights of contribution or indemnity against another who may be liable to you; and

      f.   Pay your **Deductible** when due.

   2.   You shall not, except at your own cost, voluntarily make a payment, admit liability, assume any obligation or incur any expense without our prior written consent.

J.   **Limit of Liability and Deductible**

   1.   <u>Each **Claim** Limit of Liability</u>

     The Each **Claim** Limit of Liability stated in Item 3.a. of the Declarations is the most we will pay for **Damages** and **Claim Expense** combined for any one **Claim** made during the **Policy Period** or Optional Tail Coverage (if purchased).

   2.   <u>Aggregate Limit of Liability Each **Policy Period**</u>

     The Aggregate Limit of Liability stated in Item 3.b. of the Declarations is the most we will pay for **Damages** and **Claim Expense** combined for all **Claims** made during the **Policy Period** or Optional Tail Coverage (if purchased).

   3.   <u>Deductible</u>

     We shall be liable for only that part of **Damages** and **Claim Expense** covered under this Policy which is excess of the Deductible set forth in Item 4. of the Declarations.  Such Deductible shall be borne by you uninsured and at your own risk and shall apply to each **Claim** covered by this Policy.  The Deductible applies to **Damages** and **Claim Expense** combined.

   4.   <u>Multiple **Insureds**, **Claims** and **Claimants**</u>

     Multiple **Insureds**, **Claims**, or **Claimants** shall not operate to increase our Limits of Liability as stated in Item 3. of the Declarations.  All **Claims** involving the same **Wrongful Act** or series of related **Wrongful Acts** shall be treated as a single **Claim** subject to one Limit of Liability and Deductible.  All such **Claims**, whenever made, shall be considered first made on the date the earliest of such **Claims** was first made against any **Insured**, regardless of whether such date is before or during the **Policy Period**.

   5.   <u>Reimbursement</u>

     If, at our option, we have paid any amounts for **Damages** or **Claim Expense** in excess of the Limit of Liability, or if we have paid part or all of any deductible, you shall reimburse us for such amounts upon demand. We will have the right to seek recovery from you for any **Claim Expense** or **Damages** paid by us as a result of any portion of a **Claim** that is not covered by this Policy.

K.   Other Insurance

     If other collectible insurance, including but not limited to project specific insurance, applies to a **Claim** covered under this Policy, the other insurance must pay first and this Policy is excess over such other insurance. However, this Policy will not be excess over other insurance that is specifically arranged by you or on your behalf to apply in excess of this Policy, and no other insurance applies to the **Claim**.



**L.   Policy Territory**

Coverage under this Policy applies to **Claims** made in any jurisdiction in the world.  If a **Claim** is made outside the United States of America and its territories and possessions, Puerto Rico or Canada:

1.   We shall have the right but not the duty to investigate, defend or settle any such **Claims** brought against you.

2.   If we do not exercise such right, you shall, under our supervision, arrange for such investigation and defense of the **Claim** as is reasonably necessary, and subject to our prior authorization, shall effect such settlement thereof as we and you deem expedient;

3.   Subject to the terms of this Policy, we will reimburse the **Named Insured** for the reasonable cost of such investigation and defense and the amount of any such settlement or judgment.

4.   Such reimbursement shall be made in United States currency at the conversion rate published in *The Wall Street Journal* on the date the judgment is rendered or the date that the amount of the settlement is agreed upon or the date expenditure is made.

**M.   Representations**

By accepting this Policy, you agree that:

1.   the statements made and information contained in the Application for this insurance furnished to us are true, accurate and complete, and are representations that the **Named Insured** made on behalf of all **Insureds**; and

2.   we have issued this Policy in reliance upon those representations.

If such representations or such information are not true, accurate and complete, this Policy shall be null and void in its entirety and we shall have no liability hereunder.

**N.   Severability**

Misrepresentations, concealment, breach of condition or violation of any duty under this Policy by one **Insured** shall not prejudice the interest or coverage of another **Insured** under this Policy.

**O.   Subrogation and Recovery**

In the event of any payment under this Policy, we will be subrogated to all of your rights of recovery therefore against any person or organization, and you shall execute and deliver instruments and papers and do whatever else is necessary to secure such rights. You shall do nothing to prejudice such rights.

We will have no rights of subrogation against any **Insured** hereunder, or against your clients if prior to the **Claim**, a waiver of subrogation was so required and accepted under a specific contractual undertaking by you for such client.

Any recoveries shall be applied first to us up to the amount we have paid for **Damages** and **Claim Expense**; then, to you as recovery of Deductible amounts paid as **Damages** and **Claim Expense**.

IN WITNESS WHEREOF, the Company has caused the facsimile signatures of its President and Secretary to be affixed hereto.

**AXIS Insurance Company**

Gregory W. Springer
President

Andrew Weissert
Secretary

IMPORTANT NOTICE CONCERNING

U.S. TREASURY DEPARTMENT'S OFFICE OF FOREIGN ASSETS CONTROL ("OFAC")

No coverage is provided by this Policyholder Notice nor can it be construed to replace any provisions of the Policy. You should read the Policy and review the Declarations page for complete information on the coverages provided.

This Notice provides information concerning possible impact on the insurance coverage due to directives issued by OFAC. Please read this Notice carefully.

OFAC administers and enforces sanctions policy, based on Presidential declarations of "national emergency". On an ongoing basis OFAC identifies and lists numerous individuals, entities and sanctions with respect to a particular country, including, but not limited to:

- Foreign agents;

- Front organizations;

- Terrorists;

- Terrorist organizations; and

- Narcotics traffickers;

as "Specially Designated Nationals and Blocked Persons". This list can be located on the United States Treasury's web site – http://www.treasury.gov/offices/enforcement/ofac/.

In accordance with OFAC regulations, if it is determined that an Insured or any person or entity claiming the benefits of this insurance has violated U.S. sanctions laws or regulations or is a Specially Designated National and Blocked Person, as identified by OFAC, this insurance will be considered a blocked or frozen contract and all provisions of this insurance are immediately subject to the laws and regulations administered and enforced by OFAC. When an insurance policy is considered to be a blocked or frozen contract, no payments or premium refunds may be made without authorization from OFAC. Other limitations on the premiums and payments may also apply.

Endorsement No. 1

Effective Date: 2/1/2012 @12:01 a.m. Standard Time at the address of the Named Insured
Policy Number: MBZ765473/01/2012
Insured Name: The Ballinger Company
Issuing Company: AXIS Insurance Company
Additional (Return) Premium: _____
*If the Endorsement Effective Date is blank, then the effective date of this Endorsement is the Inception Date of the Policy.*

**PENNSYLVANIA AMENDATORY ENDORSEMENT**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

This endorsement modifies insurance provided under the following:

**DESIGN PROFESSIONAL LIABILITY INSURANCE POLICY**

In consideration of the premium charged, it is agreed that:

1. Item 2. Optional Tail Coverage of Paragraph **E. Extended Reporting Period and Optional Tail Coverage** of Section **II. COVERAGE EXTENSIONS** is hereby deleted and replaced by the following:

   If you do not renew this policy or if we cancel or refuse to renew this Policy for reasons other than the nonpayment of premium or Deductible; your failure to comply with any term or condition; fraud; or material misrepresentation; and you do not replace this insurance with other insurance that provides design professional liability coverage, then upon the payment of an additional premium, you shall have the option to purchase Optional Tail Coverage, thereby extending the period during which a Claim can be made against you and reported to us.

   The premium for the Optional Tail Coverage shall be (1) 100% of the annual premium for twelve (12) months of coverage, (2) 150% for twenty-four (24) months of coverage, or (3) 200% for thirty-six (36) months of coverage.  The purchase of Optional Tail Coverage shall be endorsed herein.

   Your right to purchase the Optional Tail Coverage shall lapse unless written notice of the option elected, along with payment of the additional premium, is mailed within sixty (60) days after the effective date of cancellation or non-renewal.  If such notice and the premium are not mailed to us within thirty (60) days, then you shall not at a later date be entitled to purchase Optional Tail Coverage.

   The premium for the Optional Tail Coverage period shall be deemed fully earned at its inception. **Claims** first made during the Optional Tail Coverage shall be deemed to have been made during the **Policy Period.** Optional Tail Coverage shall apply only to **Wrongful Acts** that occurred on or after the **Retroactive Date** and prior to the effective date of cancellation or nonrenewal of the Policy.

   The Limit of Liability for the Optional Tail Coverage period shall be part of and not in addition to the Limit of Liability set forth in Item 3. of the Declarations.

2. The following is added to item 1. Cancellation of Paragraph **F. Cancellation and Nonrenewal** of Section **V. GENERAL CONDITIONS AND LIMITATIONS:**

   After this Policy has been in effect for sixty (60) days or after the effective date of renewal, this Policy may only be cancelled by or on our behalf for one of the following reasons:

   1. nonpayment of premium;

   2. the Insureds have made a material misrepresentation which affects the insurability of the risk;

   3. this Policy was obtained through fraudulent statements, omissions or concealment of fact material to the acceptance of the risk or to the hazard assumed by us;

4.   loss of reinsurance or a substantial decrease in reinsurance has occurred;

5.   a condition, factor or loss experience material to insurability has changed substantially or a substantial condition, factor or loss experience material to insurability has become known during the **Policy Period**; or

6.   the **Insureds** have materially failed to comply with this Policy's terms, conditions or contractual duties.

We shall mail by first class or registered mail or deliver written notice of cancellation to the **Named Insured** at the address shown in the Declarations at least fifteen (15) days before the effective date of cancellation if we are cancelling for the reasons listed in 1 or 2 above.  Notice of cancellation shall be provided at least sixty (60) days before the effective date of cancellation if we are cancelling for any of the reasons listed in 3 through 6 above.

3.   Item 2. <u>Nonrenewal</u> of Paragraph **F. Cancellation and Nonrenewal** of Section **V. GENERAL CONDITIONS AND LIMITATIONS** is hereby deleted and replaced by the following:

2.   <u>Nonrenewal</u>

We may elect not to renew this Policy by mailing or delivering written notice of nonrenewal to the **Named Insured** at the address shown on the Declarations Page of this Policy.  We will mail or deliver the notice at least sixty (60) days before the expiration of the Policy.

If notice of nonrenewal is mailed, proof of mailing will be sufficient proof of notice.  Delivery of the notice will be the same as mailing.

All other terms and conditions of this Policy remain unchanged.

Endorsement No.  2

Effective Date: 2/1/2012  @12:01 a.m. Standard Time at the address of the **Named Insured**
Policy Number: MBZ765473/01/2012
Insured Name: The Ballinger Company
Issuing Company: AXIS Insurance Company
Additional (Return) Premium: _____
*If the Endorsement Effective Date is blank, then the effective date of this Endorsement is the Inception Date of the Policy.*

## CONSTRUCTION MANAGEMENT AND DESIGN-BUILD

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

## DESIGN PROFESSIONAL LIABILITY INSURANCE POLICY

In consideration of the premium charged, it is agreed that Section IV. **EXCLUSIONS**, Paragraph I. is deleted in its entirety and replaced with the following:

I.    the cost to repair or replace faulty workmanship, including supervision or approval thereof, performed or failed to have been performed by you or your subcontractors or materials, parts or equipment furnished or supplied by any of the preceding. This exclusion shall not apply in situations where you are acting in the capacity of an architect or engineer or a **Construction Manager** having an agency relationship with the project owner.

It is further agreed that Section IV. **EXCLUSIONS** is amended by adding the following:

We are not obligated to pay **Damages** or **Claim Expense** or defend **Claims** for or arising directly or indirectly out of:

1.   Your failure to render **Professional Services** on time or complete any project on time or other delay. This exclusion shall not apply to those **Damages** which arise out of a **Wrongful Act**;

2.   The failure to protect any property or persons or the preparation or failure to prepare any safety precautions or procedures in connection with any project, including but not limited to temporary structures such as shoring, bracing, and scaffolding;

3.   Your bankruptcy or your advising, procuring or failure to advise or procure any financing or pay or failure to pay any sums or moneys for any project;

4.   Construction means, methods, or techniques;

5.   Cost estimates being exceeded. This exclusion shall not apply to those **Damages** which arise out of a **Wrongful Act**.

All other terms and conditions remain unchanged.

DP 0021 (Ed. 11/2010)                                                                                   Page 1 of 1

Endorsement No. 3

Effective Date: 2/1/2012 @12:01 a.m. Standard Time at the address of the **Named Insured**
Policy Number: MBZ765473/01/2012
Insured Name: The Ballinger Company
Issuing Company: AXIS Insurance Company
Additional (Return) Premium: _____
*If the Endorsement Effective Date is blank, then the effective date of this Endorsement is the Inception Date of the Policy.*

## AMENDMENT OF SECTION I.B.3.

### THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

This endorsement modifies insurance provided under the following:

## DESIGN PROFESSIONAL LIABILITY INSURANCE POLICY

In consideration of the premium charged, it is agreed that Section **I. INSURING AGREEMENT**, Paragraph B. **Defense and Settlement,** Subparagraph 3. is deleted in its entirety and replaced with the following:

3.   We may, at our discretion, investigate and settle a covered **Claim**.  If we are willing to accept the judgment of the trial or appellate court or any negotiated settlement or settlement offer and you are not willing to accept such judgment or settlement, our liability for any **Claim Expense** and/or **Damages** incurred after we indicate our willingness to accept such judgment or settlement shall be limited to the amount for which we could have resolved the **Claim**.  Nothing in this provision will cause our liability to exceed the applicable Limit of Liability set forth in the Declarations.

All other terms and conditions remain unchanged.

Endorsement No. <u>4</u>

Effective Date: <u>2/1/2012</u> @12:01 a.m. Standard Time at the address of the Named Insured
Policy Number: <u>MBZ765473/01/2012</u>
Insured Name: <u>The Ballinger Company</u>
Issuing Company: <u>AXIS Insurance Company</u>
Additional (Return) Premium: _____
*If the Endorsement Effective Date is blank, then the effective date of this Endorsement is the Inception Date of the Policy.*

**SPECIFIC PROJECT EXCESS LIMITS OF LIABILITY**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

This endorsement modifies insurance provided under the following:

**DESIGN PROFESSIONAL LIABILITY INSURANCE POLICY**

In consideration of the premium charged, it is agreed that coverage under this endorsement shall apply only to the following project:

| | |
|---|---|
| Name of Project: | Science and Engineering Complex School of Engineering and Applied Sciences and Columbian College of Arts & Sciences Foggy Bottom Campus |
| Location of Project: | The George Washington University Washington, D.C. |
| Description of Services: | Design of 6-story building |
| Retroactive Date: | 9/1/2010 |

For the purposes of the coverage provided by this endorsement, this Policy shall be considered the Primary Insurance.  This endorsement shall provide excess insurance over the Limits of Liability set forth in Item 3 of the DECLARATIONS, subject to all terms and conditions of the Primary Insurance.  This excess insurance shall apply only to the project specified above, and shall be in the following amount:

| | |
|---|---|
| $ 5,000,000 | Each **Claim** Excess Limit of Liability |
| $ 5,000,000 | Aggregate Excess Limit of Liability |

The excess insurance provided by this endorsement will apply excess of the Primary Insurance, but only in the event of the reduction or exhaustion of the aggregate limits of the Primary Insurance by payment of **Damages** or **Claim Expense** with respect to **Claims** first made and reported during the **Policy Period**, whether such **Claims** arise out of the project set forth above or any other project to which the Primary Insurance applies.

In no event shall the total Limits of Liability available for the project exceed the following, which includes the limits of liability of both the Primary Insurance and excess insurance provided by this endorsement:

| | |
|---|---|
| $ 10,000,000 | Each **Claim** Total Limit of Liability |
| $ 10,000,000 | Aggregate Total Limit of Liability |

These total Limits of Liability may be eroded by **Claims** arising out of projects other than the project listed above.

All other terms and conditions remain unchanged.

Endorsement No. 5

Effective Date: 2/1/2012 @12:01 a.m. Standard Time at the address of the Named Insured
Policy Number: MBZ765473/01/2012
Insured Name: The Ballinger Company
Issuing Company: AXIS Insurance Company
Additional (Return) Premium: _____
*If the Endorsement Effective Date is blank, then the effective date of this Endorsement is the Inception Date of the Policy.*

## BASIC TECHNOLOGY SERVICES - MANUSCRIPT ENDORSEMENT

### THIS ENDORSEMENT MODIFIES THE POLICY.  PLEASE READ IT CAREFULLY.

This endorsement modifies the insurance provided under the following:

**DESIGN PROFESSIONAL LIABILITY INSURANCE POLICY**

In consideration of the premium charged, it is agreed that:

1.  Section III. **DEFINITIONS**, Paragraph **S.** is deleted in its entirety and replaced with the following:

    S.  **Wrongful Act** means a negligent act, error or omission committed by you or any entity for which you are legally liable, including your interest in joint ventures, in the performance of **Professional Services** or **Basic Technology Services.**

    All **Wrongful Acts** that take place on or after the **Retroactive Date** and prior to the end of the **Policy Period** of the last policy we issued to you, and are related by common facts, circumstances, transactions, events and/or decisions will be treated as one **Wrongful Act.**

2.  Section III. **DEFINITIONS** is amended by adding the following paragraphs:

    **Basic Technology Services** means those **Technology Services** that are performed by you in conjunction with your **Professional Services** for a specific client of yours.

    **Technology Services** means:

    a.  computer aided design and drafting; geographic information systems (GIS); and digital modeling, including but not limited to Building Information Modeling (BIM);
    b.  creation or hosting of internet sites;
    c.  control systems design, consulting, analysis, development, modification, or programming;
    d.  installation and testing of such control systems, networks, and/or software;

    that are performed by you for others for a fee.

3.  Section IV. **EXCLUSIONS** is amended by adding the following:

    With respect to **Basic Technology Services** only, we are not obligated to pay **Damages** or **Claim Expense** or defend **Claims** for or arising directly or indirectly out of:

    a.  any mechanical or electrical failure, or failure or interruption of internet access or internet connection for any reason, including but not limited to any electrical power interruption, surge, spike, brownout, blackout or defect in hardware;

    b.  any failure to prevent unauthorized access to, unauthorized alteration of or unauthorized use of any computer system, hardware, program, network, software product or any other electronic system or product, or the unauthorized introduction of a computer virus, malicious code, or similar program to any of the foregoing;

c.   faulty workmanship or faults, defects or error in design of any computer system, hardware, program, network, software product or any other electronic system or product, if known to you prior to the final acceptance by your client;

d.   any misuse, misappropriation, or infringement of any patent, trademark, trade secret or other intellectual property, including but not limited to illegal uploads, downloads or file sharing, or any form of digital piracy;

e.   data theft;

f.   ordinary wear and tear, gradual deterioration, obsolescence, or failure to maintain the physical components of any computer system, hardware, program, network, software product or any other electronic system or product, or the failure to upgrade prepackaged software or operating systems as specified by the manufacturer or developer.

4.   Section IV. **EXCLUSIONS**, Paragraph H. is deleted in its entirety and replaced with the following:

H.   the design or manufacture of any goods or products for multiple sale that are sold or supplied by you, or by others under license from you; however, this exclusion shall not apply to control system software programs, databases, applications, or computer systems (except for computer hardware or computer system security software of any type), created or modified specifically for a client for whom you are rendering **Professional Services**.

All other terms and conditions of the Policy shall apply and remain unchanged.

Endorsement No. 6

Effective Date: 2/1/2012 @12:01 a.m. Standard Time at the address of the Named insured
Policy Number: MBZ765473/01/2012
Insured Name: The Ballinger Company
Issuing Company: AXIS Insurance Company
Additional (Return) Premium: _____
*If the Endorsement Effective Date is blank, then the effective date of this Endorsement is the Inception Date of the Policy.*

## MUTUAL CHOICE OF COUNSEL - MANUSCRIPT ENDORSEMENT

### THIS ENDORSEMENT MODIFIES THE POLICY.  PLEASE READ IT CAREFULLY.

This endorsement modifies the insurance provided under the following:

**DESIGN PROFESSIONAL LIABILITY INSURANCE POLICY**

In consideration of the premium charged, it is agreed that:

In consideration of the premium charged, it is agreed that Section I. **INSURING AGREEMENT**, Paragraph B. **Defense and Settlement**, Subparagraph 1. is deleted in its entirety and replaced with the following:

1.  We have the right and duty to defend any **Claim** to which this insurance applies, even if the allegations are groundless, false or fraudulent.

    We will mutually agree with you to legal counsel selected for the defense of a **Claim** as covered in this Policy, provided that the attorney's fees and all other litigation expense we must pay to such counsel are limited to the rates we actually pay to counsel we retain in the ordinary course of business in the defense of similar **Claims** in the community where the **Claim** arose or is being defended.  Additionally, we may exercise the right to require that such counsel have certain minimum qualifications with respect to their legal competency, including but not limited to experience in defending **Claims** similar to the one pending against you.

    You shall do nothing to prejudice our rights under this Policy, nor shall you admit liability.  No cost, charge, or related **Claim Expense** shall be incurred without our prior written consent, which shall not be unreasonably withheld.

All other terms and conditions remain unchanged.

# EXHIBIT C

Design    Professional

**Hines, Theresa**

| | |
|---|---|
| **From:** | Mea Fleming [MeaF@IIIGROUP.Com] |
| **Sent:** | Tuesday, March 27, 2012 3:58 PM |
| **To:** | US - Claim Notice ATL |
| **Cc:** | Sam Kravitz |
| **Subject:** | MBZ765473/01/2012 BALLINGER COMPANY |
| **Attachments:** | IR110000.pdf |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Completed |
| | |
| **Categories:** | Printed |

Dear Claims,

Attached please find a loss notice, correspondence from Lexington Insurance, and the dec
sheet on the referenced.  We are reporting this "For Record Only" at this time; however, the
insured feels strongly that a claim will be filed against them in this instance.  As you will
note, this matter had been previously reported  to Lexington and they declined for the
reasons
outlined in their March 5, 2012 letter.  Kindly confirm receipt, along with your file info
to:  meaf@iiigroup.com   Thank you.

Mea

Mea Fleming
PL/CL Claims Manager
Insurance Innovators Inc.
130 S. Easton Road
Glenside, PA  19038
meaf@iiigroup.com
215 885 7300 x 115

This transmission and any attachments are intended solely for the addressee. The information
contained in this transmission is confidential in nature and protected from further use or
disclosure under U.S. Pub.L.106-102, 113 U.S. Stat.1338 (1999), and may be subject to
attorney-client or other legal privilege. Your use or disclosure of this information for any
purpose other than that intended by its transmittal is strictly prohibited, and may subject
you to fines and/or penalties under federal and state law. If you are not the intended
recipient of this transmission, please DESTROY ALL COPIES RECEIVED and confirm destruction to
the sender via return transmittal.

| ACORD® GENERAL LIABILITY NOTICE OF OCCURRENCE/CLAIM | DATE (MM/DD/YY) 03/27/2012 |
|---|---|

| PRODUCER PHONE 610.363.7999 (A/C, No, Ext): FAX 610.363.5231 Roehrs & Company Inc. PO Box 100, 736 Springdale Dr Exton, PA 19341-0100 | NOTICE OF OCCURRENCE / NOTICE OF CLAIM | DATE OF OCCURRENCE AND TIME 03/27/2012 | ☐ AM ☐ PM | DATE OF CLAIM 03/27/2012 | PREVIOUSLY REPORTED ☐ YES ☐ NO |
|---|---|---|---|---|---|

EFFECTIVE DATE 02/01/2012   EXPIRATION DATE 02/01/2013

POLICY TYPE: ☐ OCCURRENCE   ☒ CLAIMS MADE

RETROACTIVE DATE

MISCELLANEOUS INFO (Site & location code)

COMPANY AXIS Specialty Insurance

POLICY NUMBER MBZ765473012012

REFERENCE NUMBER

CODE:   SUB CODE:

AGENCY CUSTOMER ID: 00000234

| INSURED | CONTACT ☐ CONTACT INSURED | |
|---|---|---|
| NAME AND ADDRESS The Ballinger Company 833 Chestnut Street Suite 1400 Philadelphia, PA 19107 | NAME AND ADDRESS | WHERE TO CONTACT |
| | | WHEN TO CONTACT |

RESIDENCE PHONE (A/C, No)   BUSINESS PHONE (A/C, No, Ext) 215.446.0900

RESIDENCE PHONE (A/C, No)   BUSINESS PHONE (A/C, No, Ext)

**OCCURRENCE**

LOCATION OF OCCURRENCE (include city & state)   Pittsburgh, PA

AUTHORITY CONTACTED

DESCRIPTION OF OCCURRENCE (Use reverse side, if necessary)   Notice Only. Project University of Pittsburgh Salk Hall is experiencing significant delays in early construction. Verbal communication with the General Contractor & owner suggest that a future design/delay claim is inevitable

**POLICY INFORMATION**

COVERAGE PART OR FORMS (Insert form #s and edition dates)

| GENERAL AGGREGATE 5,000,000 | PROD/COMP OP AGG | PERS & ADV INJ | EACH OCCURRENCE 5,000,000 | FIRE DAMAGE | MEDICAL EXPENSE | DEDUCTIBLE 150000 | ☒ PD ☒ BI |
|---|---|---|---|---|---|---|---|

UMBRELLA EXCESS   ☐ UMBRELLA ☐ EXCESS   CARRIER:   LIMITS:   PER CLAIM   PER OCCUR

**TYPE OF LIABILITY**

PREMISES: INSURED IS   ☐ OWNER ☐ TENANT ☐ OTHER:   TYPE OF PREMISES

OWNER'S NAME & ADDRESS (If not insured)   OWNERS PHONE (A/C, No, Ext):

PRODUCTS: INSURED IS   ☐ MANUFACTURER ☐ VENDOR ☐ OTHER:   TYPE OF PRODUCT

MANUFACTURER'S NAME & ADDRESS (If not insured)   MANUFACT PHONE (A/C, No, Ext):

WHERE CAN PRODUCT BE SEEN?

OTHER LIABILITY INCLUDING COMPLETED OPERATIONS (Explain)

**INJURED/PROPERTY DAMAGED**

NAME & ADDRESS (Injured/Owner)   University of Pittsburg Salk Hall   PHONE (A/C, No, Ext)

AGE   SEX   OCCUPATION   EMPLOYER'S NAME & ADDRESS   PHONE (A/C, No, Ext)

DESCRIBE INJURY   WHERE TAKEN   WHAT WAS INJURED DOING?

☐ FATALITY

DESCRIBE PROPERTY (Type, model, etc)   ESTIMATE AMOUNT   WHERE CAN PROPERTY BE SEEN?   WHEN CAN PROPERTY BE SEEN?

**WITNESSES**

| NAME & ADDRESS | BUSINESS PHONE (A/C, No, Ext) | RESIDENCE PHONE (A/C, No) |
|---|---|---|

REMARKS

| REPORTED BY Insd | REPORTED TO Gil Roehrs | SIGNATURE OF PRODUCER OR INSURED Jennifer McDade, CISR |
|---|---|---|

ACORD 3-S (12/93)   NOTE: IMPORTANT STATE INFORMATION ON REVERSE SIDE   ©ACORD CORPORATION 1993

### Applicable in California

For your protection, California law requires the following to appear on this form:
Any person who knowingly presents false or fraudulent claim for the payment of a loss is guilty of a crime
and may be subject to fines and confinement in state prison.
California Insurance Frauds Prevention Act 1871.2

### Applicable in Florida and Idaho

Any person who Knowingly and with the intent to injure, Defraud, or Deceive any Insurance Company Files a State-
ment of Claim Containing any False, Incomplete or Misleading information is Guilty of a Felony.*
* In Florida - Third Degree Felony

### Applicable in Indiana

A person who knowingly and with intent to defraud an insurer files a statement of claim containing any false,
incomplete, or misleading information commits a felony.

### Applicable in Nevada

Pursuant to NRS 686A.291, any person who knowingly and willfully files a statement of claim that contains
any false, incomplete or misleading information concerning a material fact is guilty of a felony.

### Applicable in New Hampshire

Any person who, with purpose to injure, defraud or deceive any insurance company, files a statement of
claim containing any false, incomplete or misleading information is subject to prosecution and punishment
for insurance fraud, as provided in RSA 638:20.

### Applicable in New Jersey

Any person who knowingly and with intent to defraud any insurance company or other persons, files a state-
ment of claim containing any materially false information, or conceals for the purpose of misleading, informa-
tion concerning any fact, material thereto, commits a fraudulent insurance act, which is a crime, subject to criminal
prosecution and civil penalties.

### Applicable in New York

Any person who knowingly and with intent to defraud any insurance company or other person files an applica-
tion for insurance or statement of claim containing any materially false information, or conceals for the purpose
of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a
crime, and shall also be subject to a civil penalty not to exceed five thousand dollars and the stated value of the
claim for each such violation.

### Applicable in Ohio

Any person who, with intent to defraud or knowing that he/she is facilitating a fraud against an insurer,
submits an application or files a claim containing a false or deceptive statement is guilty of insurance fraud.

### Applicable in Oklahoma

WARNING: Any person who knowingly and with intent to injure, defraud or deceive any insurer, makes any
claim for the proceeds of an insurance policy containing any false, incomplete or misleading information is
guilty of a felony.

### Applicable in Pennsylvania

Any person who knowingly and with intent to injure or defraud any insurer files an application or claim
containing any false, incomplete or misleading information shall, upon conviction, be subject to imprisonment
for up to seven years and payment of a fine of up to $15,000.

ACORD 3-S (12/93)

100 Summer Street
Boston, MA 02110
www.lexingtoninsurance.com

## LEXINGTON INSURANCE
### CHARTIS ℭ

March 5, 2012

***VIA Certified Mail – Return Receipt Requested & Email***

Patricia Cosgrove
The Ballinger Company
833 Chestnut Street, #400
Philadelphia, PA 19107

Re:  Insured:         The Ballinger Company
     Matter:          University of Pittsburg Salk Hall
     Policy Number: 21456755
     Claim Number:  683-457977

Dear Ms Cosgrove:

As you and I briefly discussed during our February 9, 2012 telephone call, I am the adjuster handling the above-referenced matter for Lexington Insurance Company (the "Company"). The purpose of this letter is to advise you that the Company will not provide coverage for this matter, as discussed in detail below.

After you have reviewed this letter, if there is additional information you would like me to consider please forward that information to me. Also, if you have any questions about the letter, please contact me at (617) 235-7781 or samuel.pierce2@chartisinsurance.com.

In considering your request for coverage, I have reviewed the insurance policy referenced above, as well as the information submitted to the Company by Ballinger. No other information was considered. If you assert a right to coverage under another policy, please submit notice pursuant to the notice provisions contained in that policy.

The Company issued to Ballinger Architects & Engineers Professional Liability Policy number 21456755 (the "Policy"), effective from 2/1/2011 to 2/1/2012, with a Retroactive date of Full Prior Acts. The Policy has limits of liability of $5,000,000 per claim, and $5,000,000 policy aggregate, subject to a $150,000 per claim deductible.

The Policy provides in its insuring agreement as follows:

I.    INSURING AGREEMENTS

A.    COVERAGES: (CLAIMS-MADE AND REPORTED)

The Company will pay on behalf of the Insured those sums in excess of the deductible shown in Item 4 of the Declarations that the Insured shall become legally obligated to pay as Damages because of Claims for a Breach of Professional Duty in the performance of Professional Services rendered to others by the Insured or any entity for whom the Insured is legally liable.

For this coverage to apply, all of the following conditions must be satisfied:

1.   The Breach of Professional Duty forming the basis of any Claim must arise out of Professional Services or Covered Operations that take place subsequent to the Retroactive Date shown in Item 8 of the Declarations and prior to the end of the Policy Period.

2.   Prior to the Effective Date of this policy, no officer, director, principal, partner, insurance manager, risk manager or corporate counsel of the Insured had knowledge of the Breach of Professional Duty or circumstance likely to give rise to a Claim under this policy.   If such officer, director, principal, partner, insurance manager, risk manager or corporate counsel of the Insured knew, prior to the effective date of this policy, of the Breach of Professional Duty or a circumstance likely to give rise to a Claim under this policy, then any continuation, change of resumption of such Breach of Professional Duty or circumstance during or after this Policy Period will be deemed to have been known prior to this Policy Period.

3.   Claim must first be made against the Insured during the Policy Period.

4.   The Insured must report the Claim to the Company, in writing, during the Policy Period or within the sixty (60) day period immediately following the end of the Policy Period.

Additionally, the Policy indicates the following with regard to the reporting of claims.

V. CONDITIONS

B. REPORTING OF A POTENTIAL CLAIM

If the Insured first becomes aware during the Policy Period of an actual or alleged Breach of Professional Duty or circumstance arising out of Professional Services which is reasonably likely to result in a Claim, the Insured may give written notice to the Company containing the

information listed below.  If such written notice is received by the Company prior to the end of the Policy Period, any Claims subsequently made against the Insured arising out of such conduct shall be deemed for the purpose of this policy to have been made on the last day of the Policy Period.  The Insured shall cooperate fully with the Company, and any investigation conducted by the Company or its authorized representatives, and shall be subject to the terms set forth in SECTION V. CONDITIONS. A. INSURED'S DUTIES WHEN THERE IS A CLAIM above as applicable to a Claim.

It is a condition precedent to the coverage afforded by this policy that the written notice shall contain the following information:

1. The actual or alleged Breach of Professional Duty or circumstance which is the subject of a potential Claim;
2. A description of the Professional Services rendered by the Insured which may result in the Claim;
3. The date(s) of such conduct which may result in the Claim; and
4. A description of the injury or damage that has or may result in a Claim;
5. The identities and address of any potential claimant(s);
6. The anticipated location(s) of any such potential Claim;
7. The circumstances by which the Insured first became aware of the potential Claim.

If all of the above information is not so provide or is, in the reasonable judgment of the Company, deemed inadequate, the Company shall inform the Insured that any Claim made after the Policy Period relating to the written notice will not be deemed to have been made during the Policy Period.

On January 31, 2012 Ballinger reported the following regarding the University of Pittsburg Salk Hall (the "Project"): "Senior management has been advised by University of Pittsburg that this project is experiencing problems and delays in its early stages." There are multiple deficiencies in this notice.  Notably, Ballinger has not noted the following: (1) the actual or alleged Breach of Professional Duty or circumstance which is the subject of a potential Claim; (2) a description of the Professional Services rendered which may result in the Claim; (3) the date(s) of such conduct which may result in the Claim; and (4) a description of the injury or damage that has or may result in a Claim. Lexington deems this notice inadequate, and hereby notifies Ballinger that any claim made in relation to the Project will not be deemed to have been made during the Policy period.  As a result, the Company denies coverage for this claim because any appropriate, future notice would occur when the Company does not insure Ballinger.

The Company's coverage position is based on the information that has been provided to date.  However, in stating the above reason for this denial, the Company does not waive any right to disclaim coverage in the future, on any other basis known or unknown at this time.  Further, this letter is not, and should not be construed as, a waiver of any terms,

conditions, exclusions or other provisions of the Policy, or any other policies of insurance issued by Lexington Insurance Company or any of its affiliates. The Company expressly reserves all of its rights under the Policy, including the right to assert additional defenses to any claims for coverage, if subsequent information indicates that such action is warranted.

If you have any additional information that you feel would either cause me to review the Company's coverage position or would assist me in my investigation or determination, I ask that you advise me as soon as possible. If you wish to have your own personal counsel become involved in this matter, at your own expense, please feel free to do so, and the Company will cooperate fully with such counsel.

Please contact me at (617) 235-7781 or samuel.pierce2@chartisinsurance.com if you have any questions or concerns regarding the contents of this letter

Thank you for your cooperation in this matter.

Very truly yours,

Samuel R. Pierce
Professional Liability Claims Examiner

cc: Kim Rhodes ☐kimrhodes@roehrs.com

# EXHIBIT D

100 Summer Street
Boston, MA 02110
www.lexingtoninsurance.com

**LEXINGTON** INSURANCE
**CHARTIS** ✦

March 5, 2012

***VIA Certified Mail – Return Receipt Requested & Email***

Patricia Cosgrove
The Ballinger Company
833 Chestnut Street, #400
Philadelphia, PA 19107

Re:  Insured:           The Ballinger Company
     Matter:            University of Pittsburg Salk Hall
     Policy Number: 21456755
     Claim Number: 683-457977

Dear Ms Cosgrove:

As you and I briefly discussed during our February 9, 2012 telephone call, I am the adjuster handling the above-referenced matter for Lexington Insurance Company (the "Company"). The purpose of this letter is to advise you that the Company will not provide coverage for this matter, as discussed in detail below.

After you have reviewed this letter, if there is additional information you would like me to consider please forward that information to me. Also, if you have any questions about the letter, please contact me at (617) 235-7781 or samuel.pierce2@chartisinsurance.com.

In considering your request for coverage, I have reviewed the insurance policy referenced above, as well as the information submitted to the Company by Ballinger. No other information was considered. If you assert a right to coverage under another policy, please submit notice pursuant to the notice provisions contained in that policy.

The Company issued to Ballinger Architects & Engineers Professional Liability Policy number 21456755 (the "Policy"), effective from 2/1/2011 to 2/1/2012, with a Retroactive date of Full Prior Acts. The Policy has limits of liability of $5,000,000 per claim, and $5,000,000 policy aggregate, subject to a $150,000 per claim deductible.

The Policy provides in its insuring agreement as follows:

I.     INSURING AGREEMENTS

A.     COVERAGES: (CLAIMS-MADE AND REPORTED)

The Company will pay on behalf of the Insured those sums in excess of the deductible shown in Item 4 of the Declarations that the Insured shall become legally obligated to pay as Damages because of Claims for a Breach of Professional Duty in the performance of Professional Services rendered to others by the Insured or any entity for whom the Insured is legally liable.

For this coverage to apply, all of the following conditions must be satisfied:

1.  The Breach of Professional Duty forming the basis of any Claim must arise out of Professional Services or Covered Operations that take place subsequent to the Retroactive Date shown in Item 8 of the Declarations and prior to the end of the Policy Period.

2.  Prior to the Effective Date of this policy, no officer, director, principal, partner, insurance manager, risk manager or corporate counsel of the Insured had knowledge of the Breach of Professional Duty or circumstance likely to give rise to a Claim under this policy.  If such officer, director, principal, partner, insurance manager, risk manager or corporate counsel of the Insured knew, prior to the effective date of this policy, of the Breach of Professional Duty or a circumstance likely to give rise to a Claim under this policy, then any continuation, change or resumption of such Breach of Professional Duty or circumstance during or after this Policy Period will be deemed to have been known prior to this Policy Period.

3.  Claim must first be made against the Insured during the Policy Period.

4.  The Insured must report the Claim to the Company, in writing, during the Policy Period or within the sixty (60) day period immediately following the end of the Policy Period.

Additionally, the Policy indicates the following with regard to the reporting of claims.

V. CONDITIONS

B. REPORTING OF A POTENTIAL CLAIM

If the Insured first becomes aware during the Policy Period of an actual or alleged Breach of Professional Duty or circumstance arising out of Professional Services which is reasonably likely to result in a Claim, the Insured may give written notice to the Company containing the

information listed below. If such written notice is received by the Company prior to the end of the Policy Period, any Claims subsequently made against the Insured arising out of such conduct shall be deemed for the purpose of this policy to have been made on the last day of the Policy Period. The Insured shall cooperate fully with the Company, and any investigation conducted by the Company or its authorized representatives, and shall be subject to the terms set forth in SECTION V. CONDITIONS. A. INSURED'S DUTIES WHEN THERE IS A CLAIM above as applicable to a Claim.

It is a condition precedent to the coverage afforded by this policy that the written notice shall contain the following information:

1. The actual or alleged Breach of Professional Duty or circumstance which is the subject of a potential Claim;
2. A description of the Professional Services rendered by the Insured which may result in the Claim;
3. The date(s) of such conduct which may result in the Claim; and
4. A description of the injury or damage that has or may result in a Claim;
5. The identities and address of any potential claimant(s);
6. The anticipated location(s) of any such potential Claim;
7. The circumstances by which the Insured first became aware of the potential Claim.

If all of the above information is not so provide or is, in the reasonable judgment of the Company, deemed inadequate, the Company shall inform the Insured that any Claim made after the Policy Period relating to the written notice will not be deemed to have been made during the Policy Period.

On January 31, 2012 Ballinger reported the following regarding the University of Pittsburg Salk Hall (the "Project"): "Senior management has been advised by University of Pittsburg that this project is experiencing problems and delays in its early stages." There are multiple deficiencies in this notice. Notably, Ballinger has not noted the following: (1) the actual or alleged Breach of Professional Duty or circumstance which is the subject of a potential Claim; (2) a description of the Professional Services rendered which may result in the Claim; (3) the date(s) of such conduct which may result in the Claim; and (4) a description of the injury or damage that has or may result in a Claim. Lexington deems this notice inadequate, and hereby notifies Ballinger that any claim made in relation to the Project will not be deemed to have been made during the Policy period. As a result, the Company denies coverage for this claim because any appropriate, future notice would occur when the Company does not insure Ballinger.

The Company's coverage position is based on the information that has been provided to date. However, in stating the above reason for this denial, the Company does not waive any right to disclaim coverage in the future, on any other basis known or unknown at this time. Further, this letter is not, and should not be construed as, a waiver of any terms,

conditions, exclusions or other provisions of the Policy, or any other policies of insurance issued by Lexington Insurance Company or any of its affiliates. The Company expressly reserves all of its rights under the Policy, including the right to assert additional defenses to any claims for coverage, if subsequent information indicates that such action is warranted.

If you have any additional information that you feel would either cause me to review the Company's coverage position or would assist me in my investigation or determination, I ask that you advise me as soon as possible. If you wish to have your own personal counsel become involved in this matter, at your own expense, please feel free to do so, and the Company will cooperate fully with such counsel.

Please contact me at (617) 235-7781 or samuel.pierce2@chartisinsurance.com if you have any questions or concerns regarding the contents of this letter

Thank you for your cooperation in this matter.

Very truly yours,

Samuel R. Pierce
Professional Liability Claims Examiner

cc: Kim Rhodes ☐kimrhodes@roehrs.com

# EXHIBIT E

# ACORD® GENERAL LIABILITY NOTICE OF OCCURRENCE/CLAIM

**DATE (MM/DD/YY)** 01/31/2012

| PRODUCER | PHONE (A/C, No, Ext) 610.363.7999 | NOTICE OF OCCURRENCE | DATE OF OCCURRENCE AND TIME 01/31/2012 | AM / PM | DATE OF CLAIM 01/31/2012 | PREVIOUSLY REPORTED |
|---|---|---|---|---|---|---|

FAX   610.363.5231

Roehrs & Company Inc.
PO Box 100, 736 Springdale Dr
Exton, PA 19341-0100

| NOTICE OF CLAIM | | | | | | YES   NO |
|---|---|---|---|---|---|---|

| EFFECTIVE DATE 02/01/2011 | EXPIRATION DATE 02/01/2012 | POLICY TYPE | RETROACTIVE DATE |
|---|---|---|---|

OCCURRENCE   X   CLAIMS MADE

COMPANY
Lexington Insurance Compa

MISCELLANEOUS INFO (Site & location code)

| CODE: | SUB CODE: |
|---|---|

AGENCY CUSTOMER ID: 00000234

POLICY NUMBER   021456755

REFERENCE NUMBER

## INSURED

NAME AND ADDRESS
The Ballinger Company
833 Chestnut Street
Suite 1400
Philadelphia, PA 19107

| RESIDENCE PHONE (A/C, No) | BUSINESS PHONE (A/C, No, Ext) 215.446.0900 |
|---|---|

## CONTACT

NAME AND ADDRESS
Trish Cosgrove
Senior Associate, Finance & Administration

CONTACT INSURED

WHERE TO CONTACT

WHEN TO CONTACT

| RESIDENCE PHONE (A/C, No) | BUSINESS PHONE (A/C, No, Ext) 215-446-0364 |
|---|---|

## OCCURRENCE

LOCATION OF OCCURRENCE (Include city & state)   University of Pittsburg Salk Hall, Pittsburg, PA

AUTHORITY CONTACTED

DESCRIPTION OF OCCURRENCE (Use reverse side, if necessary)   Senior management has been advised by University of Pittsburg that this project is experiencing problems and delays in its early stages.

## POLICY INFORMATION

COVERAGE PART OR FORMS (Insert form #s and edition dates)

| GENERAL AGGREGATE 5,000,000 | PROD/COMP OP AGG | PERS & ADV INJ | EACH OCCURRENCE 5,000,000 | FIRE DAMAGE | MEDICAL EXPENSE | DEDUCTIBLE 150000 | X PD / X BI |
|---|---|---|---|---|---|---|---|

| UMBRELLA/ EXCESS | UMBRELLA | EXCESS | CARRIER: | | LIMITS: | PER CLAIM | PER OCCUR |
|---|---|---|---|---|---|---|---|

## TYPE OF LIABILITY

| PREMISES: INSURED IS | OWNER | TENANT | OTHER: | TYPE OF PREMISES |
|---|---|---|---|---|

OWNER'S NAME & ADDRESS (If not insured)

OWNERS PHONE (A/C, No, Ext):

| PRODUCTS: INSURED IS | MANUFACTURER | VENDOR | OTHER: | TYPE OF PRODUCT |
|---|---|---|---|---|

MANUFACTURER'S NAME & ADDRESS (If not insured)

MANUFACT PHONE (A/C, No, Ext):

WHERE CAN PRODUCT BE SEEN?

OTHER LIABILITY INCLUDING COMPLETED OPERATIONS (Explain)

## INJURED/PROPERTY DAMAGED

NAME & ADDRESS (Injured/Owner)   University of Pittsburgh Salk Hall

PHONE (A/C, No, Ext)

| AGE | SEX | OCCUPATION | EMPLOYER'S NAME & ADDRESS | | PHONE (A/C, No, Ext) |
|---|---|---|---|---|---|

DESCRIBE INJURY
FATALITY

| WHERE TAKEN | WHAT WAS INJURED DOING? |
|---|---|

DESCRIBE PROPERTY (Type, model, etc)

| ESTIMATE AMOUNT | WHERE CAN PROPERTY BE SEEN? | WHEN CAN PROPERTY BE SEEN? |
|---|---|---|

## WITNESSES

| NAME & ADDRESS | BUSINESS PHONE (A/C, No, Ext) | RESIDENCE PHONE (A/C, No) |
|---|---|---|

REMARKS

| REPORTED BY Trish Cosgrove | REPORTED TO Gil Roehrs | SIGNATURE OF PRODUCER OR INSURED Paula Manley, CPCU |
|---|---|---|

ACORD 3-S (12/93)   NOTE: IMPORTANT STATE INFORMATION ON REVERSE SIDE   ©ACORD CORPORATION 1993

# EXHIBIT F



P.O. Box 4470
Alpharetta, GA 30022
678-746-9400 Phone 678-746-9315 Fax

April 10, 2012

**CERTIFIED MAIL RRR**

The Ballinger Company
Attention: Patricia Cosgrove
833 Chestnut Street
Suite 1400
Philadelphia, PA 19107

Re:      Matter:                    University of Pittsburgh Claims (Salk Hall)
          Date of Loss:             Prior to January 31, 2012
          Claim No.:                ATL 74371
          Policy No.:               MBZ765473/01/2012
          Policy Effective:         February 1, 2012 to May 1, 2013

Dear Ms. Cosgrove:

AXIS Insurance Company "("AXIS") is in receipt of a loss notice and correspondence from Lexington Insurance in connection with "Record Only" notice of potential claims arising out of a construction project at the University of Pittsburgh (Salk Hall). It is reported that verbal communication with the general contractor and owner suggests that a "future design/delay claim is inevitable". We note that this claim has been previously submitted to Lexington Insurance Company under an Architects & Engineers Professional Liability Policy which was in effect from February 1, 2011 to February 1, 2012. Lexington has denied coverage for this claim for reasons outlined in a letter of March 5, 2012.

AXIS issued a policy of Design Professional Liability insurance to The Ballinger Company, Policy No. MBZ765473/01/2012, effective from February 1, 2012 to May 1, 2013 ("AXIS Policy"). We regret to inform you that there is no coverage available to The Ballinger Company for the claims or potential claims of the University of Pittsburgh (Salk Hall) for the reasons set forth below.

The AXIS Policy contained the following terms and conditions:

**THIS POLICY IS WRITTEN ON A CLAIMS MADE AND REPORTED BASIS. COVERAGE APPLIES ONLY TO THOSE CLAIMS THAT ARE FIRST MADE AGAINST YOU AND REPORTED TO US IN WRITING DURING THE POLICY PERIOD OR OPTIONAL TAIL COVERAGE (IF PURCHASED), OR MADE AGAINST YOU DURING THE POLICY PERIOD AND REPORTED TO US IN WRITING DURING THE EXTENDED REPORTING PERIOD (IF APPLICABLE).**

**THE PAYMENT OF CLAIM EXPENSE REDUCES THE LIMIT OF LIABILITY; CLAIM EXPENSE SHALL BE SUBJECT TO THE DEDUCTIBLE AMOUNT.**

Please read the entire Policy carefully. Provisions and requirements contained in this Policy specify what is and what is not covered, restrict coverage, and designate your rights and duties.

Throughout this Policy the words "you" and "your" refer to the **Named Insured** shown in the Declarations, and any other person or organization qualifying as an **Insured** under this policy. The words "we", "us" and "our" refer to the Company providing this Insurance as specified in the Declarations. Words and phrases that appear in **Bold** have special meaning as described in Policy Section **III. DEFINITIONS**.

In consideration of your payment of premium and in reliance on the statements in the application for this Policy and subject to the Declarations and all other terms of this Policy, including any endorsements hereto, we agree with you as follows:

## II. INSURING AGREEMENT

### A. Coverage

We will pay on your behalf those sums in excess of the Deductible and up to the Limit of Liability that you become legally obligated to pay as **Damages or Claim Expense** because of **Claims** arising out of **Wrongful Acts** or **Pollution Events** that take place on or after the **Retroactive Date** and prior to the end of the Policy Period, provided such Claims are:

1. first made against you and reported to us in writing during the **Policy Period** or the Optional Tail Coverage (if purchased); or
2. first made against you during the Policy Period and reported to us in writing in writing during the Extended Reporting Period (if applicable).

This insurance applies only when prior to the effective date of the first policy issued to you and continuously renewed by us, no principal, partner, director, executive officer, or any person whose signature appears on any application of yours had knowledge of any act, error, omission, situation or event that could reasonably be expected to result in a Claim.

### B. Defense and Settlement

1. We have the right and duty to defend any Claim to which this Insurance applies, even if the allegations are groundless, false or fraudulent...

* * *

## II. COVERAGE EXTENSIONS

\* \* \*

B.  Pre-Claim Assistance and Circumstance Reporting

1.  <u>Pre-**Claim** Assistance</u>

    If you become aware of a **Circumstance** and you give notice to us of such **Circumstance** in accordance with paragraph 2. below, we at our sole discretion may elect to investigate the reported Circumstance. Until a Claim that arises from the reported Circumstance is made, we will be responsible for any costs we incur for the investigation of such Circumstance.

2.  <u>**Circumstance Reporting**</u>

    If during the Policy Period you become aware of a Circumstance and give notice to us of:

    a.  the facts and situation surrounding the Circumstance, including any associated actual or alleged Wrongful Act;

    b.  the Damages which have or may result from the Circumstance; and

    c. how and when you first became aware of the Circumstance and any associated actual or alleged Wrongful Act;

    then any Claim for which coverage is provided by this Policy that may be made against you arising out of the Circumstance shall be deemed for the purposes of this insurance to have been made on the date on which the notice was given to us.

\* \* \*

## IV. EXCLUSIONS

We are not obligated to pay **Damages** or **Claim Expense** or defend **Claims** for or arising directly or indirectly out of:

\* \* \*

L.  any **Wrongful Act**, situation, event, transaction, circumstance or matter for which notice was given by you under any design professional ... insurance coverage prior to the Inception Date of this Policy or any **Wrongful Act,** situation, event, transaction, circumstance or matter regardless of when occurring that is related to such prior notice.

The AXIS Policy defines "Circumstance" to mean "any incident or event that takes place during the Policy Period, and from which you reasonably expect that a Claim could arise." A "Wrongful Act" is defined to mean a "negligent act, error or omission committed by you or any entity for which you are legally liable, including your interest in joint ventures, in the performance of Professional Services."

**Discussion**

Coverage applies only to those Claims that are first made against the insured and reported to AXIS during the policy period. The claims by the University of Pittsburgh were made prior to the inception date of the AXIS Policy are therefore outside of the Policy coverage. Moreover, under the terms of Exclusion "L" described above, as notice was given to another design professional insurer prior to the Inception Date of this AXIS Policy, February 1, 2012, coverage is excluded for any Wrongful Act, situation, event, transaction, circumstance or matter regardless of when occurring that is related to such prior notice.

Accordingly, there is no coverage available to The Ballinger Company for any claims arising out of, related to or connected with the University of Pittsburgh (Salk Hall) project and AXIS will neither defend The Ballinger Company for any such claim that has or may be made against it.

This response in no way constitutes, nor should it be considered, a relinquishment by AXIS of any and all other defenses available to it under the terms and conditions of the insurance contracts, and neither anything in this letter, nor any act of AXIS is to be considered a waiver of any known or unknown defenses. AXIS reserves the right to rely upon any additional defenses as they become known.

If you have any questions, please feel free to contact me at 678-746-9451.

Sincerely Yours,

Michele A. Pepe
Assistant Vice President
Excess & Umbrella Claims

cc:   Insurance Innovators, Inc.
      Attention:  Sam Kravitz
      130 S. Easton Road
      Glendale, PA 19039

# EXHIBIT G



# University of Pittsburgh

*Facilities Management Division*

3400 Forbes Avenue
Pittsburgh, Pennsylvania 15260
412-624-9500

October 31, 2012

Mr. Jeffrey S. French, AIA
Ballinger
833 Chestnut Street, Suite 1400
Philadelphia, PA 19107

RE:   Salk Hall Upgrade and Addition, Project No. D.G.S. 1103-385
      Contract No. 08-122-000
      University of Pittsburgh No. X4066

Dear Mr. French:

This letter is to serve as notification that the above referenced project has and is continues to experience significant impacts to the scope of work and the budget due to errors and omissions. In addition to impacts experienced to date there are issues that are currently unknown. Below is a summary of the impacts known to date along with costs, if known. The descriptions below are only general and not meant to provide a full summary of the issues.

**Hillside Stabilization (Gabion Wall)** – ASI 001 was issued by Ballinger on February 10, 2011 and after numerous RFI, meetings, and correspondence the decision was made to change from a gabion to soil nail design. This decision was made in July 2011 that the gabion design would not be sufficient and either a soil nail or H-pile and lagging system would be needed to stabilize the hillside. On August 23, 2011, Burchick was instructed to proceed with a soil nail system. ASI 19-R1 was issued and priced at a value of $851,871. Subsequently ASI 028 was issued that incorporated the finish to the soil nail wall. The finish was agreed to be face brick, and the price is $215,624.

**Mine Grouting, Caissons, Structural Slab** – There have been several RCO's issued relating to the attempts to grout the soil under and around the addition, and the discovery of expansive soils. They are RCO 0013, 0014, 0020, and 0021. The costs respectively are (-$6,470), $35,100, (-$118,143), and $0. RCO 0021 is a no cost change to agree to grout quantity and unit price for grout. The attempts to grout were abandoned in favor of changing the foundation design from spread footings with a few caissons to all caissons, grade beams, mud slab, and waterproof membrane under mud slab with a structural first floor slab.

Mr. Jeffrey French
October 31, 2012
Page 2 of 3

RCO 0044 dated April 10, 2012 was issued to cover the cost of inspection and testing of the soil nail wall by GeoMechanics in the amount of $49,269.

ASI-004 R1 was issued July 20, 2011 in the amount of $808,758. This ASI added the caissons.

ASI-005 R1 was issued March 13, 2012 in the amount of $1,547,000. This ASI added the grade beams and structural slab.

RCO 0067 was issued October 2, 2012 in the amount of $10,612. This is to cover the costs to cut the caisson sleeves to the correct elevations. This cost was excluded from ASI-004 R1 by the contractor.

RCO 0065 was issued September 20, 2012 in the amount of $584. This is to address vertical cuts at mud slab.

RCO 0038, ASI-018 R1 was issued February 22, 2012 in the amount of $581,919. The RCO covers the costs first floor structural steel, and the slab on deck.

The above RCO/ASI's to **do not** include all costs from the MEP prime contractors. The costs from the primes are to install grade beam openings, hangers, working in the crawl space, remediation of expansive soils, and do not include schedule impacts.

**Structural Steel Storage** – The decision was made to fabricate and store the structural steel in order to minimize the impacts to schedule and escalation costs. Three RCO's (0035, 0035.1, and 0035.2) have been issued covering storage costs from the original schedule steel start date to the new steel start date. The total cost of these RCO's is $444,655.62.

**Tower Crane** – The change of the foundation system from spread footings to caissons and grade beams prevents a crawler crane from erecting the structural steel. The cost that has been submitted by Burchick is $562,909. The electrical contractor's cost to provide power to the crane is $10,693.

**Misc. Costs** – There are various other costs that have been identified to date and are listed below.
- Plumbing additional excavation resulting from ASI 5 R1 and ASI 19 R1 in the amount of $81,835.
- Mechanical and Electrical changes resulting from ASI 14, Crawl Space in the amount of $39,248.
- Temporary water line for soil nail wall per RCO 0051 in the amount of $5,720.
- Additional excavation and backfill at D line wall due to the expansive soils per RCO 0055 in the amount of $97,393.
- Additional storm piping on Sutherland Drive resulting from ASI 19 R1 per RCO 0054 in the amount of $67,606.

The above costs which total $5,586,183.62 **DO NOT** address the schedule impacts. It must be noted there are outstanding change orders that may add to the totals of error and omission.

Mr. Jeffrey French
October 31, 2012
Page 3 of 3

In addition to the above, Ken Gardiner and I were communicating about the value of Ballinger's contract with the University. Per my email to Ken of September 14, 2012, Ballinger's contract has a value of $3,846,875 and payments through invoice number #31518 and #31711 are $3,820,345.70.   Since my last communication with Ken, we have received two additional invoices #32449 & 32622, which I can't authorize payment since it would create an over billing situation.

Very truly yours,

Christopher L. Niemann
Senior Manager, Project Managers
Planning, Design, and Construction Department

Cc: A. Garfinkel, D. Marcinko, T. Stamps, D Klimchock, P. Rankin

# EXHIBIT H



**Burchick
Construction
Company
Inc.**

REC'D
PITT-FM
12/11/12

December 6, 2012

Mr. Christopher L. Niemann
University of Pittsburgh
Facilities Management Division
3400 Forbes Avenue
Pittsburgh, PA 15260

Re:   University of Pittsburgh Salk Hall Addition and Upgrades
      University Contract No. 10-278/DGS Contract No. 1103-385.1
      University Project No. X4066/General Construction
      Burchick Job No. 10-006-C
      General Approvals

Dear Mr. Niemann,

This is to confirm that for the last two years of this project we have experienced active interference by the
Architect's lack of approving our submittals in a timely manner, asking for additional items/information to
be submitted that is not required by the contract specifications and changing the project scope through
submittals returned approved as noted.

Burchick Construction Company has made every effort to comply or exceed the requirements of the
contract specifications.

The following are a few of the approval items that stand out confirming this purposeful delay by the
Architect:

1. The YKK windows have not been approved.

| #85 | YKKM and YCW750 Product Data and Test Reports<br>Portions Rejected 08/17/11 | Submitted 07/22/11 |
| #88 | Curtainwall Shop Drawings<br>Not Reviewed 08/19/11 | Submitted 07/08/11 |
| #88.1 | Revised Curtainwall Shop Drawings<br>Rejected 06/26/12 | Submitted 03/16/12 |

Face to face meeting with Ben Patane and Jim Ranalli on 6/26/12.  Ben said he wants
model #YCW 750XT.  Jim Ranalli agrees to provide this model even though the original
YKK model which was submitted exceeds the specifications and costs him more to provide.
Agreed this is it, no more questioning product, just finish shop drawings, etc. and proceed.

|  | Mock-up Revised Drawings<br>Returned 08/24/12 - Asked for Test Data | Submitted 07/31/12 |



Mr. Christopher L. Niemann
Page 2
December 6, 2012

| | | |
|---|---|---|
| #88.2 | Revised shop drawings submitted per Ben's selection of YKK product. (with preliminary calculations)<br>Not Returned | Submitted 09/10/12 |
| 09/07/12 | YKK issues letter on performance of the YCW 750XL system<br>Not Accepted - Wants Test Data | |
| 10/11/12 | At submittal meeting Ben clarifies mullions at corner windows and asked for test performance data (CRF) before he will review the shop drawings or YCW 750XT which he directed us to use. | |
| 11/19/12 | Test performance numbers were emailed to Ben to expedite.<br>Not Accepted - Wants actual test reports published before he will look at anything. | |

2. The Food Service Equipment (Final selection of plastic laminate made 11/28/12.)

| | | |
|---|---|---|
| #1 | Equipment List - This was our first official submittal.<br>Approved 02/01/11 | Submitted 12/27/10 |
| #11 | Equipment Brochures<br>Approved 02/25/11 | Submitted 02/09/11 |
| #12 | Food Service Rough-in Drawings<br>Approved 03/17/11 | Submitted 02/22/11 |
| #24 | Sneezeguard Pipe Finish Colors (requested)<br>Approved 04/29/11 | Submitted 03/22/11 |
| #25 | Metal Locker Color Chart (requested)<br>Approved 04/29/11 | Submitted 03/22/11 |
| RFI #124 | Burchick Construction submittal to remind the Architect that the plastic laminate color needs selected.<br>Deferred Answer - 03/15/11<br>Architect's reply was the selection had to be deferred until the millwork submittal was approved. | Submitted 03/08/11 |
| | Millwork Shop Drawings<br>Approved as Noted/Resubmit 07/17/12 | Submitted 04/19/12 |
| | Millwork Wilsonart Plastic Laminate Samples<br>Approved as Noted 08/16/12 | Submitted 06/06/12 |
| 11/28/12 | Actual color selection returned to Burchick Construction for #11 submittal cover dated 02/10/11 and answer to RFI #124.<br>Color selected - Black #1595-60 with the Architect's comment "per recently updated submittal" | |



Mr. Christopher L. Niemann
Page 3
December 6, 2012

3. Flush Wood Door Veneer (Not Approved)

| | | | |
|---|---|---|---|
| #4 | Wood Veneer Color Samples | Submitted 01/20/11 | Approved as Noted 03/28/11 |
| #64 | Wood Veneer Samples | Submitted 06/06/11 | Rejected |
| #64.1 | Wood Veneer Samples | Submitted 10/04/11 | Rejected |
| #64.2 | Wood Veneer Samples | Submitted 11/21/11 | Rejected 12/20/11 |
| #64.3 | Wood Veneer Samples | Submitted 02/22/12 | Rejected 03/12/12 |
| #64.4 | Wood Veneer Samples | Submitted 04/11/12 | Rejected 04/24/12 |
| #64.5 | Wood Veneer Samples | Submitted 06/20/12 | Rejected 06/21/12 |

07/08/12   VT manufacturer provided a letter stating the samples meet the AA grade specified with options.  (Received no response from Ben)

09/27/12   Ben requested AWI Certification/Registering Project - This is not a required submittal to get the door samples approved, it is just to confirm that the installed doors meet the AWI standards.

We also have experienced the lack of having necessary revisions due to existing conditions or Owner requested changes taking months to be resolved.  Some examples are listed below:

1.   The turnaround pull off at the west parking lot and the wing wall that is needed.

2.   The hillside excavation to install the site utilities behind 'D' line due to the foundation design.

3.   The latest ASI #40 changing the materials behind the VM Zinc flat lock panels; insulation from rigid to mineral wool and plywood from CDX to fire rated issued one week before the original project completion date.

4.   Landscaping - Currently No Final Design

Burchick Construction has provided information to assist in the design and evaluation of these and other changes with little implementation of the information provided.

Burchick Construction requested separate submittal meetings to address these issues early on in the project, as we saw the issues building up and not getting resolved.  Instead of working through the issues in a cooperative pro-active way, the Architect asks for more submittals, not required in the specification, prior to approval or defers answer based on another product submittal.



Mr. Christopher L. Niemann
Page 4
December 6, 2012

The process must change.  This project will not complete by October 31, 2014 if the Architect is permitted to continue to not meet his contract obligations.  Approval return times, providing necessary dimensions which are missing from the contract drawings, etc. are his responsibility.  Burchick Construction is not to be used by the Architect to decide if his specified product is appropriate for the project.  It is the Architect's responsibility to determine this before his specified product is listed in the specification.

We cannot possibly meet our current completion date of October 31, 2014 if the approval process is not corrected.  There will be additional expenses as a result of this purposeful delay and hindrance of the project.

By doing nothing, you are acknowledging that the University owes Burchick Construction money for the delays and Burchick Construction will ensure it is added to our claim.  Burchick Construction will update you on the anticipated completion date which is expanding as we speak.

Very truly yours,

BURCHICK CONSTRUCTION COMPANY, INC.

Joseph E. Burchick
President

JEB/sg

cc:   Barry Bandura
      John Finney